**STATE of Missouri, Respondent,**

**v.**

**Sanford THOMAS, Appellant.**

**No. 53601.**

Supreme Court of Missouri,
Division No. 1.

April 14, 1969.

John C. Danforth, Atty. Gen., Jefferson City, Gene E. Voigts, Sp. Asst. Atty. Gen., North Kansas City, for respondent.

Alfred I. Harris, St. Louis, for appellant.

SEILER, Judge.

Defendant appeals from a conviction of first degree murder of a cab driver, with a sentence of life imprisonment.

From the evidence in the case, the jury could reasonably have found the following to be the facts:

On Sunday evening, November 27, 1966, defendant, age 17, had been riding with six or seven other youths around the North Florissant and Cass Avenue neighborhood in St. Louis. The group was in two automobiles. Around 8:00 p. m., they went to the Greyhound bus station. One of the boys testified that he had told a detective in the investigation later that someone in the group had said he didn't have any money, so they started joking about getting some money and Frederick Brown said, "Let's go stick up somebody", although the witness also testified that this statement to the detective was a lie. At the bus station Brown and defendant got into a taxicab driven by John Dougherty, defendant in the rear seat and Brown in front. The cab then drove off, going south on Broadway. One of the youths who had walked around the bus terminal with Brown and defendant came running back to where the others had parked and said that Brown and Thomas had gotten in a cab and were going to 16th and Mullanphy. The others tried to follow the cab but lost it in the traffic, so they drove to Brown's house. An hour or so later Dougherty was found in the front seat of his cab at 16th and Mullanphy, unconscious. One of his teeth was knocked out and he was bleeding from two stab wounds on the left side of his chest. One wound penetrated the heart and proved fatal.

Niles Pursley, one of the youths, said Brown and defendant came to Brown's house on Chambers Street. The others were already there in the kitchen. Brown and defendant entered through the back door. As to what happened then, Pursley testified on direct examination:

"Q. When they came in, I want you to tell Judge Mayfield and the jury what they did, when they came in.

"A. They said, they threw a watch and wallet on the table,[1] and said that was all they got, they robbed the cab driver.

"Q. Did anybody else come in with them?

"A. No, sir."

On cross-examination the witness testified:

"Q. (continuing) And they entered. Is that right, into the kitchen?

"A. Yes.

"Q. And did Brown stay in the kitchen?

"A. Well, they stayed a few minutes, and made a statement, they got this knife and money, this watch and wallet.

"Q. Brown told you he got the watch and wallet?

"A. I'm not certain, which one said it, one of the (sic) them said it.

"Q. You don't know which one made the statement?

"A. No, not for sure, one of them did.

"Q. Then, what happened?

"A. Then, they went, well, we sat there for awhile, and I went in the latrine, a couple went into the living room, and one was going through the wallet.

"Q. You don't know which one?

"A. No, sir."

Lonnie Anderson, another of the youths, testified he talked to Frederick Brown the next day. Brown was wearing the wrist watch. He told Anderson that he had robbed and killed the cab driver and laughed about it, said that he had stabbed him and showed Anderson the knife, which was a pocket knife produced by the state as exhibit 1, but said nothing about defendant being with him. Anderson admitted he told the police that when Brown and defendant arrived at the house Sunday evening as

1. The watch and wallet were identified as belonging to the cab driver Dougherty.

they entered Brown said "We stuck up a cab driver" and laughed and talked about it and that Brown also said, "Yeah, I stabbed him."

Some pieces of charred paper which Frederick Brown pointed out to the officers in a garbage can at the house where he was arrested the day following the murder were identified as some of the papers the cab driver carried in the wallet.

The knife was given to the witness, Niles Pursley, the next day at Brown's house by Brown's girl friend. Pursley gave the knife to his father, who in turn gave it to the police. The police serologist said there was human blood on the knife, but not enough to determine the type.

Defendant, who apparently had no previous record, testified. He said that he and Brown got in the cab together and that Brown whispered, "Let's rob the cab driver", but defendant refused to go along with this and got out of the cab at 14th and Cass. He said he caught another cab and went to 18th and Cass to see if Brown were there at his mother-in-law's house. About this time Brown came walking up the street, so they both got in another cab, which defendant had called, and went to Brown's house on Chambers and Florissant, where they went inside. He denied participating in the crime and denied that he and Brown walked into the kitchen and threw the watch and wallet on the table in front of the others and said "That's all we got out of the robbery".

The question before us is whether the evidence is insufficient to make a submissible case. Defendant argues it is a miscarriage of justice for a man to be sentenced to life. imprisonment on what he describes as "trifles of evidence".

With regard to defendant's participation in the crime, the jury had the following before it:

1. One of the youths told the detective that someone in the group said he didn't have any money, so they started joking about getting some money and that Brown said "Let's go stick up somebody". This came in without objection.

2. It was established that Frederick Brown and defendant entered Dougherty's cab at the bus station to go to 16th and Mullanphy.

3. About an hour later the cab driver was discovered at 16th and Mullanphy in the front seat of his cab, dying from stab wounds. No knife was found on him or in his cab.

4. About the same time, Frederick Brown and defendant arrived where their friends were gathered, said they robbed the cab driver, threw a watch and wallet on the table and said that was all they got. Brown said, "Yeah, I stabbed him."

5. The watch, wallet and its contents were identified as belonging to the victim, Dougherty.

6. Dougherty died of a stab wound in the heart.

7. Defendant did not produce any of the persons who he said were at the house where he claimed he went looking for Brown after leaving Brown in the cab. He said he arrived there alone and that Brown came along on the sidewalk after defendant had called another cab.

8. Defendant admitted he and Brown entered Brown's house together through the kitchen.

■ It was not shown whether defendant or Brown made the statements in the kitchen of Brown's house and tossed the watch and wallet on the table, but the evidence was one or the other did in the other's presence. If we assume defendant made the statements, they would constitute his own admissions of being a party to the crime. If we assume Brown made them, then defendant by his silence under the circumstances adopted and assented to Brown's statement and it is receivable against defendant as an implied admission, State v. Kissinger, 343 Mo. 781, 123 S.W.2d

**470**

81, 83; State v. Lovell, 235 Mo. 343, 138 S.W. 523, 525; Wigmore on Evidence (3rd Edition) Vol. IV, § 1071, pp. 70–74; Annotations, 80 A.L.R. 1235 and 115 A.L.R. 1510. " * * * The crystallization of the experience of men shows it to be contrary to their nature and habits to permit statements, tending to connect them with actions for which they may suffer punishment, to be made in their presence without objection or denial by them, unless they are repressed by the fact that the statement is true. Consequently, silence under accusation is some evidence from which the jury may infer that the accused acquiesced in the statement and admitted its truth * * *." 80 A.L.R. 1235, 1236. Defendant made no effort to claim that he had no intention of acquiescing in Brown's words by his failure to make any objection or reply at the time. His explanation at the trial was to deny the making by either of them of any such statement. It is possible, given the distorted sense of values which defendant seems to have had, that defendant stood by in silence because he was willing for his friends to believe that he was capable of committing the crime and did not want them to consider him "chicken" in their eyes. If so, he could have offered this explanation at the trial, but he did not.

There also is an element present here of possession by defendant and Brown jointly of the stolen watch and wallet. Under the evidence, "they" threw them on the table. This action, whether by Brown or defendant, shows possession with an unlawful intent and further strengthens the inference that defendant was involved in the robbery in the absence of any denial on his part, Wigmore on Evidence (3rd Edition) Vol. IV, § 1781, pp. 225–228.

Anderson's testimony as to what Brown told him the following day was brought out on cross-examination, without objection or motion to strike. The general rule is that inadmissible hearsay which goes in the record without objection may be considered by the jury in determining the facts, State v. Willis (Mo.Sup.) 283 S.W. 2d 534, 537; see also 79 A.L.R.2d 890, 896, 901, with many Missouri cases cited.

We hold the evidence is sufficient to support the verdict.

The case having been submitted under the felony-murder doctrine, defendant's contention that the court erred in refusing to instruct on second degree murder is not valid and is overruled, State v. Glenn (Mo.Sup. banc) 429 S.W.2d 225, 234; State v. Taylor (Mo.Sup.) 421 S.W. 2d 310, 320.

Judgment affirmed.

All of the Judges concur.