Sanford THOMAS, (Movant) Appellant,

v.

STATE of Missouri, Respondent.

No. 57819.

Supreme Court of Missouri,
Court en Banc.

June 24, 1974.

Rehearing Denied July 22, 1974.

Jack M. Chasnoff, Clayton, for movant-appellant.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

HOLMAN, Judge.

In 1967, Sanford Thomas was found guilty of the first degree murder of John Dougherty and his punishment was fixed at life imprisonment. Upon appeal to this court the judgment was affirmed. State v. Thomas, 440 S.W.2d 467 (Mo.1969). In 1970, Thomas filed a motion to vacate under S.Ct. Rule 27.26, V.A.M.R. After an evidentiary hearing the motion was denied. An appeal was taken from that judgment to this court and we reversed and remanded for a new hearing. This for the reason that we concluded that the findings of fact and conclusions of law were insufficient to enable us to appropriately review the matter and, since the trial judge had retired, we considered a new hearing essential. Thomas v. State, 465 S.W.2d 513 (Mo. 1971). After the second evidentiary hearing the trial court, on March 20, 1972, entered a judgment overruling the motion. Thomas (hereinafter referred to as defendant) duly appealed to this court. We have jurisdiction because the case involves a conviction for first degree murder, and the appeal was pending here at the time of our order of April 9, 1973, retaining jurisdiction in such cases. See Parks v. State, Mo., 492 S.W.2d 746. We affirm.

It was stipulated at the hearing that the transcript of the original trial and the transcript of the first 27.26 hearing would be considered as a part of the record in the second hearing. In our determination of this appeal we have read and considered all these transcripts (totaling 628 pages).

We think it helpful at the outset to briefly state the facts developed at the original trial. On Sunday evening, November 27, 1966, defendant had been riding around the North Florissant and Cass Avenue neighborhood in St. Louis with a number of other youths. About 8 p.m., they went to the Greyhound Bus Station. At the station one Frederick Brown and defendant got into a taxicab, driven by John Dougherty, and the cab proceeded south on Broadway. One of the youths who had been with Brown and defendant at the bus terminal came back to where the others were parked and reported that Brown and defendant were going to 16th and Mullanphy. The others tried to follow the cab but lost it in the traffic and then drove to Brown's house. Sometime later, Dougherty was found in the front seat of his cab at 16th and Mullanphy unconscious. A tooth was knocked out and he was bleeding from two stab wounds in his chest, which wounds proved fatal.

There was further testimony that Brown and defendant later went to Brown's house and entered the back door into the kitchen where the other boys were assembled, and that they threw a watch and wallet on the table and said "that was all they got, they robbed the cab driver." The watch and wallet were later identified as having belonged to Dougherty. One of the youths told his father something about what had occurred and his father reported the matter to the police.

Brown was arrested the next day and pointed out to officers a garbage can in which they found portions of the partially burned wallet and pieces of charred paper that had been in it. The knife used in the murder was given to Niles Pursley by Brown's girl friend and was recovered by the police.

Defendant, who apparently had no previous criminal record, was the only witness for the defense. He stated that after he and Brown entered the cab Brown whispered, "Let's rob the cab driv-er," but that he refused to go along with that plan and got out of the cab at 14th and Cass. He further stated that he later got another cab and went to 18th and Cass to see if Brown was at his mother-in-law's house; that about that time he saw Brown walking up the street so they both got into another cab and went to Brown's house, where they went inside. Defendant denied participating in the crime and denied that he and Brown walked into the kitchen and threw the watch and wallet on the table and said, "That's all we got out of the robbery."

The grounds alleged in the amended motion to vacate which are relevant to this appeal are:

"(a) New evidence which proves that this defendant is innocent of first degree murder of John Dougherty. (See exhibit 'A' attached to the original petition.) The trial court erred in failing to direct a verdict for defendant, or, for the same reason, failing to set the verdict aside;

\*　　\*　　\*　　\*　　\*　　\*

"(d) The quality of legal representation received by the defendant at his trial was such as to constitute a fraud upon him and the court and to destroy any possibility of his receiving a fair trial.

"(e) The court and the defendant, through his attorney, were substantially misled by false statements made by the prosecuting attorney, Mr. Fredericks, about the lack of availability of the witness, Frederick Brown."

The evidence adduced at the hearings on the motion is as follows: During the original trial the assistant circuit attorney asked leave to strike the name of Frederick Brown from the list of State's witnesses and such was granted. He announced at that time that Brown had hepatitis, was quarantined, and would not be available as a witness. At the beginning of the hearing on the motion to vacate, it was stipulated that said statement was errone-

ous and that Brown did not have hepatitis at that time. The manner in which the error occurred was not made clear, although there was some indication that perhaps this Brown had been confused with another prisoner by the same name.

Frederick Brown testified that he had entered pleas of guilty to charges of murder and robbery of John Dougherty and had received two life sentences which he was then serving in the Missouri penitentiary. He stated that he had previously made a confession to the police in which he stated that defendant was a participant in those crimes; that defendant did not participate in the crimes and that he implicated him in order to "cover up" for two other persons who did participate; that he was actually assisted by Walter Williams who was in the cab (and is now deceased), and by Lonnie Anderson who drove up behind the cab in a car; that after he had been in the penitentiary quite a while, and Williams and Anderson had done nothing to help him, he decided he should try to help defendant because defendant was innocent, and that he (Brown) had helped put him in the penitentiary; that he then made an, affidavit stating the true facts and delivered it to defendant; that if defendant is granted a new trial he is willing to testify at the trial and to state that defendant had nothing to do with the crimes in question. He further testified that he had known Dougherty previously and had participated with him in the commission of at least two crimes.

Mrs. Dorothy Thomas, defendant's mother, testified that she had employed Alfred Harris to represent defendant in his trial and had paid him sums of money from time to time for his services; that she had difficulty getting to see him at his office, and had waited in the corridor of the courthouse from time to time in an effort to see him; that she could only get to see him briefly when she went to the office to pay money; that she requested that he go see defendant but that he did not do so except on one occasion; that she later told Mr. Harris that she wanted him to pay her money back so she could get someone else to represent defendant but he would not refund the money; that he did not tell her that he had previously known Mr. and Mrs. Dougherty.

Defendant testified that after he heard that the police were looking for him he left town and stayed away about a month; that he returned the last of December 1966, and surrendered to the police; that Mr. Harris came to see him in February 1967 while he was in jail and talked with him about the case; that he did not see him again until the day his trial started, which was in November of that year; that on the morning of the trial Mr. Harris told him that if he would enter a plea of guilty to a reduced charge his sentence would be ten years, but that he had refused to do so; that he learned for the first time during the trial that Harris had at one time represented either Mr. Dougherty or his wife, and that if he had known that before he would not have wanted Harris as his attorney. He stated that he had wanted Harris to have Frederick Brown as a witness, although if he had known that Brown had made a statement implicating him, he would not have wanted him to testify. Defendant further complained in his testimony that Mr. Harris did not discuss with him whether he should testify and did not tell him that he could refuse to testify; that he first learned that he would be a witness when Harris, during the trial, told him to pay attention to the evidence because he would later testify.

Alfred Harris testified that he had been an attorney for 30 years and had specialized in the criminal practice; that he had tried hundreds of criminal cases; that after he was employed by Mrs. Thomas he discussed the case with Mr. Fredericks, the assistant circuit attorney handling the case, and that Fredericks discussed what the State's evidence would be; that he then discussed the case at length with the defendant and developed a theory of defense that he should use defendant as a witness

because he had a clean record and was emphatic in his position that he was innocent, and that he had reason to hope that defendant could convince the jury of his innocence; that he learned of the confession that Frederick Brown had made which implicated the defendant and, for that reason, did not want to use Brown as a witness because the facts in the confession implicating defendant could be brought out in impeaching Brown's testimony in the event Brown repudiated the confession and stated that defendant did not participate in the crime; that when Mr. Fredericks announced that Brown had hepatitis and would not be at the trial, he (Harris) made objections, but was actually happy that he would not be there and made no effort to subpoena him or use other means to obtain his presence at the trial; that he did not interview Brown because he knew he did not want to use him in any event, and did not recall defendant having requested that he interview witnesses at the home of Brown's mother-in-law where defendant had stated he had gone after he left the cab; that he had seen and talked with defendant many times prior to the trial; that he had been in constant touch with defendant's family and had a very cordial relationship with them; that he engaged in "plea bargaining" with Mr. Fredericks and was able to get him to agree to recommend a ten-year sentence, which he recommended to defendant but that defendant did not accept it; that he had known Dougherty and his wife because Mrs. Dougherty, who owned a tavern, had consulted him a few years before about some sort of liquor law violation; that the fact that he had previously known them had no effect whatever upon his defense of the case; that he had mentioned this fact casually to defendant's parents when he had discussed the case with them.

The findings and conclusions of the trial court are stated in detail in nine pages of the transcript. We summarize those findings as follows: that Fred Brown, Jr., had previously confessed to participating in the robbery-murder of John Dougherty and in said confession implicated the defendant as as assailant; that at the time Brown entered his pleas of guilty he was informed of the contents of his confession implicating defendant and that he agreed in court that the facts were correct as recited by the circuit attorney; that he did not repudiate those facts until he signed an affidavit two years later, which was after defendant had been convicted and his conviction affirmed by the Supreme Court; that based upon Brown's demeanor, his contradictory statement, and his previous testimony, he was not a credible witness; that as to the allegation that defendant was ineffectively and improperly represented by Alfred Harris, the court found from the testimony that during defendant's confinement Harris visited him on more than one occasion, and during those visits discussed the merits of his defense and other witnesses who might substantiate it; that there was no conflict of interest by reason of the fact that Mr. Harris had previously represented Mrs. Dougherty in a legal matter, and that the acquaintance of Mr. Harris with her had no adverse effect on his representation of defendant; that in regard to the contention that Harris failed to interview witnesses, the court found that Mr. Harris discussed the State's evidence with Mr. Fredericks on numerous occasions, read the confession of Fred Brown, saw the contents of the State's file including the statements of witnesses endorsed by the State, and that the defense witnesses named by defendant would not have been of considerable value because they would have only placed defendant in the home of Brown's mother-in-law at some time during the evening, and that failure to interview those witnesses did not amount to ineffective assistance of counsel.

The court further found that during the trial Mr. Harris told defendant that he did not have to testify but that, in his opinion, defendant should testify and that his failure to do so would be detrimental to his defense; that the transcript disclosed that

no damaging testimony was elicited on cross-examination of defendant, and that the decision to have defendant testify was a matter of trial strategy and defendant was not prejudiced thereby. In regard to the alleged false statement of Mr. Fredericks regarding the availability of Brown as a witness, the court found that there was no showing that the prosecutor acted in bad faith; that the decision of Mr. Harris not to obtain his presence to testify was a matter of trial tactics and that the decision not to use him as a witness indicated sound judgment and did not amount to ineffective assistance of counsel; that Alfred Harris had tried many criminal cases before juries; that he had the ability to represent defendant, and that he exercised his ability effectively and competently in the trial and appeal of defendant; that at no time prior to trial, during trial, or during the appeal did defendant or his mother express dissatisfaction with the services rendered by Mr. Harris; that the trial transcript clearly shows Mr. Harris represented defendant with competence and effectiveness.

The court concluded that defendant had failed to carry his burden of proving the allegations of his motion, had failed to demonstrate that his conviction was unjust, and that he is not entitled to relief upon his motion.

Upon this appeal defendant has listed twelve "Points Relied On." They can, however, be consolidated into three principal contentions, as follows: The court erred (1) in not making specific findings and conclusions on all issues; (2) in failing to find that defendant had ineffective assistance of counsel; and (3) in failing to grant relief because of the alleged false and misleading statements of the circuit attorney concerning the lack of availability of Frederick Brown, Jr., as a witness.

■ There is no merit in defendant's contention that the trial court failed to make specific findings of fact and conclusions of law. It is, of course, true that the court did not make a specific finding as to every fact testified to by each witness, but such is not necessary. The court made adequate findings on all issues sufficient to enable this court to properly review the contentions advanced on appeal, and that constituted a compliance with Rule 27.-26(i).

We next consider defendant's contention that he had ineffective assistance of counsel. In McQueen v. State, 475 S.W.2d 111 (Mo.1971), it is stated in the concurring opinion of Finch, C. J., at p. 116:

"The test on this question which this court has stated on several occasions is whether counsel's actions, or lack thereof, have made the trial a farce or mockery of justice. Garton v. State, Mo., 454 S.W.2d 522, 530; Holbert v. State, Mo., 439 S.W.2d 507, 509; Holt v. State, Mo., 433 S.W.2d 265, 267. This is the test which many federal courts, including the Court of Appeals for the 8th Circuit, have adopted. Cardarella v. United States, 8 Cir., 375 F.2d 222, 230, cert. den. 389 U.S. 882, 88 S.Ct. 129, 19 L.Ed.2d 176; Kress v. United States, 8 Cir., 411 F.2d 16, 22; Borchert v. United States, 9 Cir., 405 F.2d 735, 738, cert. den. 394 U.S. 972, 89 S.Ct. 1466, 22 L.Ed.2d 753; Johnson v. United States, 10 Cir., 380 F.2d 810, 812; cases cited in 17 Mod.Fed. Prac.Dig., Crim.Law, ■

"Stated in this language, the rule perhaps sounds unduly restrictive or harsh by reason of the choice of descriptive terminology. However, I believe that examination of the cases indicates that in most instances the courts, after stating such a test, have sought actually to ascertain whether there has been such failure on the part of the attorney that defendant has not had a fair trial. If he has not had such a trial, the courts, even though using the farce and mockery terminology, have granted a new trial. Where, however, the court has concluded that under the evidence before it the defendant had a fair trial, then he has not

123

been granted another trial on the basis of lack of effective assistance of counsel."

■ We wish to state in general at the outset of our consideration of this point that we have carefully read the transcript of the trial with the view of determining whether defendant had a fair trial and have concluded that he did. In his conduct of the defense, Mr. Harris skillfully conducted the cross-examination of the State's witnesses and the examination of defendant as a witness. He made appropriate objections where necessary, displayed a familiarity with all of the facts, and in every way that we can detect, did all that an attorney should have done in the trial of the case.

We will briefly discuss certain specific complaints concerning representation by Mr. Harris. It is said that Harris conferred with defendant on only one occasion before trial. Mr. Harris testified to the contrary. We agree with the finding of the trial court in favor of Mr. Harris on that issue. In any event, he obviously was prepared for trial when the trial date arrived. Complaint is also made of his failure to interview witnesses. There was certainly no occasion for him to interview Brown because he had decided not to use Brown as a witness in any event. There is a sound basis for the conclusion of Mr. Harris not to use Brown even if he had agreed to repudiate his confession and to testify that defendant was not involved. This because there was no direct testimony that defendant was in the cab when the crimes were committed, and it could have been very damaging to defendant for evidence to have come in (even though for purpose of impeachment) giving details of his participation in the robbery and murder. As to the two persons whom defendant said were at the home of Brown's mother-in-law, it is conceded that Harris did not interview them. There is, however, no showing that they would have been helpful to defendant. Actually, defendant's testimony would indicate the con-

trary. He stated he did not arrive at the house until from 30 to 45 minutes after he left the cab. The murder took place three blocks from the place where he got out. It would therefore be reasonable to conclude that those proposed witnesses would not have established an alibi for defendant.

■ Defendant contends that in some undefined manner his defense was handicapped by the fact that Mr. Harris had represented Mrs. Dougherty at some previous time. This contention is without merit. A lawyer who represents a client is certainly not disqualified for the rest of his life from accepting employment by a person having an interest which may conflict with that of a prior client. Mr. Harris testified that this fact had nothing to do with his representation of defendant and we conclude, from a reading of the transcript of the trial, that such is evident. Mr. Harris obviously did not think it was improper because the first question he asked Mrs. Dougherty on cross-examination brought out that fact. Moreover, Mrs. Dougherty was not an important witness since she was used only to identify the watch and wallet of deceased. We agree with the finding of the trial court to the effect that there was no conflict of interest in this instance and that no adverse effect on the representation of defendant by Mr. Harris resulted therefrom.

As indicated by the foregoing, we rule that the representation of defendant by Mr. Harris did not constitute ineffective assistance of counsel.

■ Defendant next contends that his defense was prejudiced by the fact that the prosecutor gave false information to the court as to the illness of Frederick Brown and that he was misled thereby. What we have heretofore said will indicate our view that defendant was not prejudiced by that development. There is a reasonable basis for the view that it was to defendant's benefit that Brown did not appear as a witness. If he had testified against defendant it would have been very damaging

to his defense. If he had been a witness for either the State or defendant, and had repudiated his confession involving defendant as an active participant, he could have been impeached by showing all the details of the confession as to defendant's part in the commission of the crimes. Since Mr. Harris did not intend to use Brown as a defense witness, there was no prejudice resulting from the incorrect information furnished by Mr. Fredericks. We accordingly rule this point against defendant.

■ The next contention of defendant is that "Judge Palumbo erred in treating Frederick Brown's credibility as an issue in the evidentiary hearing and as the basis for extensive cross-examination of Brown by the assistant circuit attorney with respect to the facts and circumstances surrounding the murder and Brown's subsequent statements." No case or other authority is cited in support of that contention and we fail to understand any basis for complaint. It is always proper to cross-examine a witness about any relevant matter in order to test his credibility. Also, the credibility of a witness is always a proper matter for the consideration of the trial court. As we understand the trial court's finding, it was to the effect that the court did not believe Brown's testimony and hence his testimony afforded no basis for setting aside the judgment. The court did not find, as defendant seems to indicate, that a jury would not believe Brown in the event he testified at a trial on the merits. This point is therefore overruled.

■ Although it is not expressly raised as a "Point Relied On," we have decided that we should mention ground (a) of the motion, which alleged that defendant had new evidence which would prove his innocence and therefore the court should have set the verdict aside. This, of course, refers to the fact that Brown now says that defendant was not present when the crimes were committed and that he is willing to so

testify if a new trial is granted. The trial court, after discussing Brown's conduct and testimony at some length, disposed of this contention by a finding that Brown was not a credible witness and therefore defendant had offered no credible evidence to support that ground. We defer to the trial court's finding in that regard and accordingly rule that ground (a) does not afford any basis for setting aside the judgment.

■ It is also defendant's contention that "Judge Palumbo erred in finding as a fact that at no time prior to trial, during trial, or during appeal of his conviction did Sanford Thomas or his mother express dissatisfaction with the quantity or quality of the services rendered by Alfred Harris." We fail to see how that finding is of substantial importance in considering the merits of the case. However, the finding is supported by the testimony of Mr. Harris and hence the trial court's action in making such finding cannot be said to be clearly erroneous.

In conclusion, we mention two well settled principles we have followed in arriving at our decision in this case, i. e., (1) that the credibility of the witnesses is largely a matter for determination by the trial court and that appellate courts often defer to its findings in that regard; and (2) that S.Ct. Rule 27.26(j) provides that "appellate review shall be limited to a determination of whether the findings, conclusions and judgment of the trial court are clearly erroneous." As indicated, we agree with the findings and conclusions of the trial court and therefore do not conclude that they are "clearly erroneous."

We should perhaps mention that in addition to the brief filed by his attorney, we have considered the pro se brief filed by defendant but find that it presents nothing new.

The judgment is affirmed.

PER CURIAM:

The Division One Opinion by HOLMAN, J., is adopted as the opinion of the Court en Banc.

MORGAN, HOLMAN, HENLEY and FINCH, JJ., concur.

DONNELLY, C. J., and BARDGETT, J., concur in result.

SEILER, J., dissents in separate dissenting opinion filed.

PER CURIAM Filed.

MORGAN, HOLMAN, HENLEY and FINCH, JJ., concur in result.

DONNELLY, C. J., and BARDGETT, J., concur in result.

SEILER, J., dissents in separate dissenting opinion filed.

SEILER, Judge (dissenting).

I must respectfully dissent. After a review of all the evidence I am left "with the definite and firm conviction that a mistake has been committed." Crosswhite v. State, 426 S.W.2d 67, 71 (Mo.1968).

Unlike McQueen v. State, 475 S.W.2d 111 (Mo.1971), this is not a case where all defendant can offer is that had proper investigation been made or had the state not made a false statement as to the availability of an important witness, it "might well be" that substantial helpful evidence would have been available to defendant. In the case before us, the witness Frederick Brown, Jr., who unquestionably had firsthand, personal knowledge, would have testified, had he been called as a trial witness, that defendant was not a participant in the stabbing and robbing of the cab driver; that, on the contrary, defendant left the taxicab before the crime took place. The trial court at the 27.26 hearing, in considering the testimony of Brown, did not find that Brown would not so testify, but rather that he was not a credible witness. Despite this opinion of the trial court, it does not follow that Brown would not be a credible witness to a jury, which would be the body finding the facts in a new trial where Brown would be a witness. It is not unusual for a jury to believe a witness whom a judge would not believe and vice versa. In fact, one assumption in our widespread use of juries is that juries are more likely to reach a truthful result than a single trier of the fact. As has been said before, no one can say what a jury will do with a case, McQueen v. State, supra, l. c. 118, 123, and there is no way we as judges can be sure what a jury would do with Brown's testimony.

We do not know what Brown would have told defendant's original trial counsel had he (Mr. Harris) interviewed Brown prior to the first trial. The record shows that Brown had already pleaded guilty to first degree murder and robbery before defendant Sanford Thomas came to trial, so Brown had nothing to fear with respect to self-incrimination in telling the truth as to the nonparticipation of Thomas. Interestingly, Lonnie Anderson,[1] one of the state's witnesses at the original murder trial, testified that when he talked to Frederick Brown the day after the crime and Brown told him about stabbing the cab driver and taking his watch, Brown made no mention whatever of Sanford Thomas being with him in the crime. Yet, as is conceded, defense counsel made no effort to interview Brown, the one person who knew all the facts.

In fact, Mr. Harris interviewed none of the witnesses, although the state listed sixteen witnesses with their addresses and

---

1. Lonnie Anderson was one of the group of young men who were together on the Sunday evening of the crime. He went to the bus station with the others and was present at Frederick Brown's house later in the evening. Lonnie Anderson was also one of the witnesses whom defense counsel made no effort to interview or investigate.

called fourteen witnesses at the trial. Granted that some of these witnesses went to matters about which there was no real dispute, this is not the case, in my opinion, with respect to witnesses Lonnie Anderson and Frederick Brown. Mr. Harris testified his policy was not to interview state witnesses, that the "line is so thin between tampering with state's witnesses".

Although he testified that the witness whom both defendant and his parent's "dwelt on" was Frederick Brown and that Brown was "the one we had to decide what role he would play in our defense", Harris did not interview Brown. The facts are that Brown pleaded guilty on October 17, 1967, and remained in the city jail until November 9, 1967, when he entered the penitentiary. The trial of defendant Thomas did not commence until November 13, 1967, so Harris had ample time in which to interview Brown and find out whether Brown was really going to stand by his statement that Sanford Thomas was involved, which is the only way it could be determined if Brown should be used as a witness in Thomas' behalf despite the statement. But Harris did nothing of the sort. He testified, in response to a question as to whether he interviewed Brown in the city jail: "No. The only thing we could have done possibly was to take his deposition and I was scared to do that for fear I would hurt the defendant more than help him."

Of course, it is not correct that the only thing Harris could have done was to take Brown's deposition. He could have talked to Brown directly, without taking his deposition, the same as with any witness. Harris' professed explanation for not interviewing Brown is not convincing. The real explanation probably is found in his stated policy of never interviewing the state's witnesses, a policy which was described in McQueen v. Swenson, 498 F.2d 207, 216 (8th Cir., 1974) as follows: "[Counsel's] assertion that he never interviews prosecution witnesses is an absurd and dangerous policy which can only be viewed as an ab-

dication—not an exercise—of his professional judgment."

In the McQueen case, counsel had not interviewed any' of the state's witnesses. Counsel there also said it was his policy never to interview the state's witnesses and he, too, professed that to do so would put him in a bad light and it would "[look] like you are tampering with the State's witnesses when you [try to] talk to them", but, as said, the court was not impressed.

In the McQueen case, the court went into the matter of whether failure to investigate amounts to ineffective assistance of counsel and held that in the circumstances there present it did. The court quoted with approval (498 F.2d at 217) from Goodwin v. Swenson, 287 F.Supp. 166, 182–183 (W.D.Mo.1968), where it was said: "The most able and competent lawyer in the world can not render effective assistance in the defense of his client if his lack of preparation for trial results in his failure to learn of readily available facts which might have afforded his client a legitimate justiciable defense".

In the McQueen case, after holding there was ineffective assistance of counsel, the court remanded the case for the district court to determine whether the failure to investigate prejudiced the defense. The court cautioned, however (498 F.2d at 220): "But this is *not* to say that, on remand, petitioner must prove his innocence even by so much as a preponderance of the evidence; nor should we be understood to suggest that the Court may trespass upon what properly would have been the jury's province of weighing the truth or falsity of this evidence at the original trial. What we are saying is that, here, the petitioner must shoulder an initial burden of showing the existence of admissible evidence which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant either on cross-examination or in his case-in-chief at the original trial. Once this showing is made, a new trial is warranted unless the court is able to declare a belief that the

omission of such evidence was harmless beyond a reasonable doubt. Cf. Chapman v. California [386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]".

In our case, Brown's testimony that defendant was not involved in the crime, that defendant had left the taxicab, would have been admissible, it could have been discovered by reasonable investigation, and it could have proved helpful to the defendant in the original trial. It cannot be said the omission of this evidence was harmless beyond a reasonable doubt and a new trial is in order.

It is said that even had counsel interviewed Brown and learned that Brown would exonerate defendant Thomas, Brown would have been subject to impeachment by his former confession, which would disclose the fact that originally he had said defendant Thomas was present and participating. This is true, but again we cannot say with any certainty how the jury would have viewed Brown's testimony, and we do know that the way the case was tried did not work out very well, either—the only defense offered for defendant was defendant himself and the outcome, despite the fact defendant had a clean record and was only 17 years of age, was a conviction and a life sentence by the jury.[2]

Additionally, since the administration of justice should be above reproach if the moral force of the law is to be maintained, I do not believe the false statement made by the state as to why the state was not going to call Brown as a witness can be overlooked or treated as of no consequence. The reason given—that Brown was unavailable because he had hepatitis and was in quarantine—leaves the impression the state would otherwise have used him as a witness. In view of what Brown has said in the two 27.26 hearings in this case, it is quite clear the state would not have wanted him as a witness. The state correctly concluded it did not need Brown in order to convict Thomas and the state no doubt was aware that defense counsel had not interviewed Brown. We will never know whether the state knew that Brown would recant his confession as to the participation of Thomas if Brown were to testify in the Thomas trial, but we do know the state did not see fit to call as a witness at the 27.26 hearings any of the persons who handled its case at the original trial. We also know that the way the state handled its decision not to use or produce Brown eliminated any chance that Brown would be physically present in St. Louis during the trial and available to the defense for interviewing and questioning.

In my opinion, when we consider whether defendant Sanford Thomas had a fair trial we necessarily have to consider the question in light of what we know could have been presented to the jury had Brown been available and interviewed. So considered, Thomas did not have a fair trial. Brown was the ringleader and had he testified, defendant's protestations of innocence would not have rested on defendant's word alone. Perhaps the jury would not have believed Brown, but it is an impossible burden for any defendant to prove that the evidence which should have been uncovered and used would have acquitted him and we should not require this. It is clear, however, that the way defendant's case was prepared and tried, combined with the untrue representation by the state as to Brown's unavailability and why the state was not going to call him as a witness, deprived defendant of critical and possibly decisive evidence. A fortiori, he did not have a fair trial.

I would vacate the judgment and remand the case for a new trial.

2. The jury did not give the defendant the death penalty, but this is hardly surprising and is not of major significance on the ineffective assistance of counsel point, as the record shows the prosecution was willing to recommend a sentence of ten years if defendant would plead guilty, a clear indication of what the state thought of the chances of getting a death penalty.