**STATE of Missouri, Plaintiff-Respondent,**

v.

**Kevin Howard LEWIS, Defendant-Appellant.**

No. 14778.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 10, 1987.

James W. Drese, Public Defender, Lake Ozark, for defendant-appellant.

William L. Webster, Atty. Gen., Jeffrey Philip Dix, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

A jury found defendant Kevin Howard Lewis guilty of two counts of vehicular manslaughter as defined and denounced by § 565.024.1(2), RSMo Supp.1984. His punishment was assessed at 4½ years imprisonment on each count. It was ordered that the sentences be served consecutively. The defendant appeals, contending: 1) that a privileged communication was erroneously received in evidence; 2) that the State should have been compelled to assist him in obtaining the presence of Jeffrey Ogden as a witness, and 3) that hearsay evidence of his guilt was erroneously admitted.

This prosecution grew out of a fatal automobile collision which occurred on Interstate Highway 44 on August 15, 1985. The defendant, who was 18 years of age at the time of trial, was a member of the United States Army Reserve. He lived in Tulsa, Oklahoma, with his wife. He was scheduled for two weeks' active duty at Fort Leonard Wood, and was traveling to Fort Wood with a companion when the accident occurred.

The defendant prepared for active duty by engaging in an evening of drinking with Jeffrey Ogden, a friend who was also a member of the defendant's reserve unit. During the evening preceding the fatal accident, the defendant and Ogden "drank about a fifth of Crown Royal and a twelve pack of Coors Light." The defendant's testimony was that he was "very drunk" when he and Ogden left Tulsa. They left Tulsa about 11:30 p.m., by defendant's rough estimate. Initially Ogden drove and the defendant was a passenger. Ogden's vehicle was a black Ford pickup.

The defendant's account of his trip east to the place of the accident was hazy and indefinite, but the black pickup was observed by several other motorists about 8 a.m. on August 15. Benny Coble, an employee of the State Highway and Transportation Department, was on his way to Rolla. Coble encountered the black pickup a short distance east of Lebanon, in Laclede County.

Coble was driving east about 55 MPH. He looked in his rearview mirror and noticed the black pickup "pretty close to [him] and gaining rapidly." The pickup was being driven erratically; when Coble first

saw it, the driver "had two wheels off ... the paved shoulder [and] was attempting to gain control and get back onto the pavement." Believing that the pickup could not pass him without striking him, Coble "kept [his] same speed and pulled off on the shoulder." He estimated the speed of the black pickup at "approximately eighty miles per hour." The pickup was "partly on the shoulder" with Coble when it passed him.

As Coble "topped the hill" just west of the Gasconade River he could see there had been an accident. The pickup was "on its top" on the shoulder southeast of the eastbound lane, and there was a smaller car, still in the eastbound lane, perhaps a hundred feet east of the pickup. A number of vehicles had already stopped in both lanes of the highway, and Coble considered it unnecessary to stop. He did stop at Patrol Headquarters in Rolla, advised the officers that he was a witness, and continued to his destination.

The State also had the evidence of Steven Crane and his father, W.H. Crane. These witnesses were traveling east on I–44, "going to St. Louis to a ballgame." Steven, who was driving, testified that he saw the black pickup shortly before the accident occurred. The witness usually watched his rearview mirror a good deal, and when he first saw the black pickup, it was "real close" to his bumper. Then the driver "kind of backed off" and the witness noticed the driver was "driving kind of erratically." As Crane was watching him, the driver "ran off to the side ... a little bit on the right." Finally, as the pickup started around Crane's vehicle, Crane "had to pull over to the side ... because [the pickup] was over the center line." Crane estimated the speed of the pickup to be 60 to 65 MPH. Shortly thereafter, Crane saw the pickup run off the road onto the shoulder on the southeast side of the eastbound lane, and in Crane's words, "he crashed into the back of the parked car."

"[T]he parked car" was a small blue Ford, occupied by one Krebs and his son. Apparently, the force of the collision killed the occupants of this vehicle instantly.

The size of the Krebs' vehicle and the force of the impact was such that the top of the Krebs' automobile had to be "cut loose" so the bodies of the occupants could be removed. Krebs and his son were pronounced dead at the scene and their bodies were removed by the coroner.

While the sufficiency of the evidence has not been directly questioned, a preliminary word or two on this subject is appropriate. Section 565.024.1(2), RSMo Supp.1984, provided, in pertinent part, that:

"1. A person commits the crime of involuntary manslaughter if he: ...

(2) While in an intoxicated condition operates a motor vehicle in this state and, when so operating, acts with criminal negligence to cause the death of any person...."

Section 565.002(4) defined "intoxicated condition" to mean "under the influence of alcohol, a controlled substance, or drug, or any combination thereof;" § 565.002(5) defined "operates" as meaning "physically driving or operating or being in actual physical control of a motor vehicle." "Criminal negligence" was defined by § 556.061(6) as having the meaning specified in § 562.016.5, RSMo 1978, which in turn provided that:

"A person 'acts with criminal negligence' or is criminally negligent when he fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

The State thus had the burden to show beyond a reasonable doubt that the defendant was: 1) an intoxicated driver (2) who operated a motor vehicle with criminal negligence (3) to cause the death of another person. *State v. Kliegel,* 674 S.W.2d 64, 66 (Mo.App.1984). There is no doubt that the defendant was in an intoxicated condition. Section 577.001.2, RSMo Supp.1984, defined "intoxicated condition" as being "under the influence of alcohol, a controlled substance, or drug, or any combination thereof." It was stipulated by the State and counsel for the defendant that defendant's blood alco-

hol content was .16 percent a short time after the accident occurred. There was some evidence indicating defendant's blood alcohol content was greater than .16 percent when the accident occurred, but a blood alcohol content of .16 percent was sufficient to sustain a conviction under the provisions of § 577.012.1, RSMo Supp.1984 —driving with excessive blood alcohol content—and was certainly sufficient to show the defendant was "under the influence" of alcohol.

■ Further, there can be no doubt that the State's evidence amply supported a finding of criminal negligence. "Criminal negligence" is conduct which amounts to a gross deviation from the standard of care which a reasonable person would exercise in the situation. *State v. Kliegel*, 674 S.W.2d at 67[5]. In this case, the State's proof was that the black pickup in which the defendant and his companion were riding was being driven east on an interstate thoroughfare at a dangerous rate of speed at a time when the traffic was heavy and the occupants of the pickup were both tired and intoxicated.

Nevertheless the witnesses who saw the accident—Mr. Crane and his father—could not identify the defendant as the driver of the black pickup and it is not surprising that the defendant maintained he was not driving the pickup when it struck the Krebs automobile. An orderly disposition of the appeal requires us to note there was evidence of the defendant's criminal agency, even though the sufficiency of the evidence to sustain the convictions is not directly questioned.

The accident was investigated by two members of the Missouri State Highway Patrol—Corporal James Corsentino and Trooper Kenneth Percival. When Corporal Corsentino arrived at the scene of the accident, he found that both Ogden and the defendant were lying on an embankment close to the pavement. Corsentino did not directly address either man, but, refreshing his recollection from notes made at the time, he recalled conversation between the two occupants of the pickup. Trooper Corsentino testified thus:

"... The exact statement [made] by Lewis was ... excuse me, by Ogden was, 'You were driving weren't you, Kevin, you crazy f_____?' Lewis responded with the following answer, 'Yes, yeah, I fell asleep.'"

Trooper Percival arrived at the scene of the accident 30 to 40 minutes after the fatal collision occurred. Percival first checked the occupants of the pickup and found them lying on the ground near the highway. Their injuries were not life-threatening injuries, so he checked the occupants of the Krebs vehicle. Trooper Percival determined that the occupants of that vehicle were dead. He then made a preliminary check of the occupants of the pickup. The man lying nearest the pickup stated he was Kevin Lewis and that he was the driver. As we read the record, Trooper Percival then advised the defendant of his *Miranda* rights and the defendant indicated he understood his right to remain silent.

Both Ogden and the defendant were, as we have indicated, removed to the hospital at Fort Wood. At the hospital, Percival interrogated both men. He testified about the interrogation thus:

"Kevin Lewis's [sic] statement, I asked, 'Were you driving the truck?' He said, 'Yeah, cause he kept running off the road.' When I asked, 'Where did you start driving,' and he said 'We were in Missouri.' And I asked again, 'Were you driving when you came through Springfield?' He said 'Yes, it was before daylight when I started driving.'"

■ In our view, the statements overheard by Trooper Corsentino were admissible as admissions. Our courts have consistently held that any statements made by a defendant, which tend to incriminate him and connect him with the crime charged, are admissible when voluntarily made. *State v. Thresher*, 350 S.W.2d 1, 9 (Mo. 1961); *State v. Sinovich*, 329 Mo. 909, 917, 46 S.W.2d 877, 881 (1931). Trooper Percival's initial, precustody inquiry was not a custodial interrogation, *State v. Hale*, 463 S.W.2d 869, 871 (Mo.1971), and the interrogation which followed the Miranda warning appears to have been voluntary. Although

our review has been undertaken ex gratia, we conclude the State established the defendant's criminal agency beyond a reasonable doubt, and to reiterate, that the evidence was amply sufficient to support the judgments of conviction.

The defendant's first assigment of error is that the trial court erred in permitting Dr. Carol Ortenzo to testify as to matters told to her by the defendant while the doctor was treating him for bodily injuries and trauma. Defendant argues that the evidence received was privileged under the provisions of § 491.060(5), RSMo 1986.[1]

The two reservists, Ogden and the defendant, were taken from the place where the casualty occurred to the emergency room at the Fort Wood Army Community Hospital. They were initially treated in the emergency room. Lewis was placed in a part of the room called "the bay area" where patients may be closely observed. Ogden was put in the "suture area," which is a place for patients with less serious injuries.

The defendant was treated by two physicians. Dr. Pollock ordered certain medical tests, including a test for blood alcohol content. Dr. Carol Ortenzo examined the defendant. Over the defendant's objection, the State was permitted to ask Dr. Ortenzo if she had determined who was driving the black pickup when the accident occurred. Dr. Ortenzo replied that she had, and her interrogation proceeded as follows:

"Q. And what did Kevin Lewis respond to you?

A. He responded that he was the driver of the vehicle.

Q. Okay. What else did he say to you?

A. He told me that originally Private Ogden was the driver of the vehicle but they had both been drinking and apparently the vehicle was swerving along the road and Private Lewis was afraid that they were going to crash and die so he decided to have them pull over and he took ... he took the wheel thinking that he would be better able to drive the vehicle and still get them to Fort Wood on time to report for duty."

On cross-examination, Dr. Ortenzo repeated that she had asked defendant if he was driving when the accident happened, and he had indicated he was.

The State argues that the physician-patient privilege did not attach to the defendant's statement that he was driving because the disclosure was made publicly and freely in the presence of third persons, and the statement was not necessary to enable the physician to prescribe for her patient. In the circumstances, both arguments are well taken. Our Supreme Court has held that a patient may waive the physician-patient privilege by disclosing facts freely and publicly in the presence of third persons whose presence is not necessary to the patient's treatment. *State v. Scott*, 491 S.W.2d 514, 519[8] (Mo.banc 1973); *State v. Burchett*, 302 S.W.2d 9, 17[9] (Mo.1957). Such a waiver could be found here. Trooper Percival testified that he was present in the emergency room when the defendant stated he was driving the black pickup and that he actually heard the inculpatory statement.

Further, as the trial court ruled, the physician-patient privilege applies only to those communications necessary to prescribe treatment, and the person claiming privilege has the burden to show that necessity. *Griffith v. Continental Casualty Co.*, 299 Mo. 426, 442, 253 S.W. 1043, 1047[2] (banc 1923); 8 Wigmore, Evidence § 2383, pp. 842–44 (McNaughton rev. 1961). Dr. Ortenzo did testify that she routinely asked a motor vehicle accident patient whether he was the driver or a passenger, but there is no record indication that the defendant's medical treatment depended in any manner upon his being a passenger in

---

1. Which, as here material, reads: "The following persons shall be incompetent to testify: ... (5) A physician or surgeon, concerning any information which he may have acquired from any patient while attending him in a professional character, *and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon.*" (Our emphasis.)

or the driver of the pickup. The point is without merit.

A further assignment of error is that the trial court erred because it did not compel the State to assist counsel for the defense in locating and obtaining the presence of Jeffrey Ogden.

This point cannot be adjudicated on its merits because, upon the record filed here, it does not appear that counsel ever asked the trial court's assistance in locating Jeffrey Ogden so his testimony could be obtained. Counsel baldly asserts that the Sheriff of Laclede County knew where Ogden was, but no record fact or circumstance supports this assertion. We agree that an accused has a right to compulsory process to compel the attendance of witnesses in his behalf. U.S. Const.Amend. VI; Mo. Const. Art. I, § 18(a); *State v. Oliver*, 572 S.W.2d 440, 445[1] (Mo.banc 1978). There is nothing *of record*, however, to indicate that right was infringed. We cannot rule a point in favor of a defendant when the facts on which the point is premised do not appear of record. *State v. Williams*, 623 S.W.2d 552, 554 (Mo.1981).

As a final point, the defendant contends the trial court erred in receiving hearsay testimony. As we have indicated, Trooper Percival interrogated both the defendant and Jeffrey Ogden. On direct examination, Percival was interrogated in this manner:

"Q. Okay. And did you question Jeffrey Ogden?

A. Yes, I talked to Jeff ... Jeffrey just briefly there at the scene. And then later I talked to him more extensively at the hospital; and also Kevin Lewis more extensively at the hospital.

Q. And who did Jeffrey Ogden indicate to you was driving the automobile?

A. He told me also that Kevin Lewis was driving."

This testimony was *received without objection*. Trooper Percival also testified that while Ogden and the defendant were lying on the shoulder of the road after the accident, he, Percival, " ... heard Jeffrey Ogden ask or state that Kevin, something to the effect that Kevin was driving, and he said, 'Yeah, I fell asleep.' "

 We agree that what Jeffrey Ogden told Trooper Percival was hearsay and was objectionable as such. Nevertheless the testimony now complained of was received without objection. To preserve error in the admission of evidence, an objection to it must be made. *State v. Lovelace*, 461 S.W.2d 733, 735 (Mo.1971). So, the rule which controls this point is that inadmissible hearsay which goes in the record without objection may be considered by the jury. *State v. Thomas*, 440 S.W.2d 467, 470[3] (Mo.1969); *State v. Stidum*, 684 S.W.2d 448, 450[1] (Mo.App.1984).

We find no prejudicial error in any respect briefed and presented to this court. Accordingly, the judgment is affirmed.

PREWITT, P.J., and FLANIGAN and MAUS, JJ., concur.