**Vincent GARZA, Appellant,**

v.

**Warden Charles L. WOLFF, Nebraska State Penitentiary, Appellee.**

**No. 75–1420.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1975.

Decided Dec. 23, 1975.

Paul Scott Dye, Omaha, Neb., for appellant.

Bernard L. Packett, Lincoln, Neb., for appellee.

Before CLARK,* Associate Justice, and LAY and ROSS, Circuit Judges.

## MR. JUSTICE CLARK:

This is an appeal from a denial of the habeas corpus application brought by Vincent Garza, appellant, attacking his jury conviction for forcible rape. *State v. Garza,* 187 Neb. 407, 191 N.W.2d 454 (1971). He is now serving a twenty to thirty-five year sentence in the Nebraska Penal Complex and has exhausted his state post-conviction remedies. *State v. Garza,* 191 Neb. 118, 214 N.W.2d 30 (1974).

The United States District Court, upon conclusion of a habeas corpus hearing, made the following findings:

> The evidence adduced at trial showed that the prosecutrix left a party with her boyfriend's brother, Ron Bartlett, and the two were walking home when they were approached by a car containing petitioner, petitioner's brother, Steve Garza, and Jim Mueller and Louis Godoy. The prosecutrix and her companion voluntarily entered the car to go for a ride, and Mr. Bartlett was subsequently dropped off. The car containing the other four men and the prosecutrix continued on to a park where all the occupants except the prosecutrix and petitioner got out of the car to urinate. The prosecutrix testified that petitioner forced her to leave the car and walk down a trail where he forcibly raped her. She was then returned to the car and driven to a girlfriend's house. The petitioner testified in his own defense that when the car arrived at the park, the other men left the car to urinate. He remained in the car alone with the prosecutrix for about ten minutes except when both left the car to urinate. He admitted making advances toward the girl but claimed that he stopped when she rebuffed him. After about ten minutes, the other occupants returned to the car and the prosecutrix was driven to a girlfriend's home. Dr. James Ryder testified for the state that when he examined the prosecutrix the day after the incident she had had sexual intercourse recently.

At the hearing on the post-conviction motion Louis Godoy and Steve Garza testified that they were in the car the night of the alleged rape, that they left the car for only a short time to urinate, that they were within twenty feet of the car at all times and did not see or hear anything which would lead them to believe that a rape was committed, and that neither petitioner nor the prosecutrix left the car. In effect, their testimony would have cast doubt upon a rape having occurred.

Garza raised five points of error in his challenge to the Nebraska conviction: (1) the State trial court lacked jurisdiction; (2) the evidence was insufficient; (3) the admission into evidence of repetitive leading and suggestive interrogation of two key State witnesses on crucial testimony against appellant was prejudicial; (4) improper and prejudicial remarks in the closing argument of the prosecutor were made; and (5) he was denied the effective assistance of counsel.

### I.

We find no merit in any of the contentions save the last one, *i. e.,* the denial of effective assistance of counsel, and reverse upon it. In the light of the

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

new trial, however, we point out our view that jurisdiction is present under Nebraska Reissue Revised Statutes, § 29–1301.01 to 29–1301.03 (1943), since the accused allegedly committed several acts in Douglas County in furtherance of the offense and the prosecutrix was brought back into Douglas County subsequent to the alleged rape. While we find the evidence of the offense weak, we cannot say that the proof is totally devoid of credible evidence of the offense. *Cunha v. Brewer,* 511 F.2d 894, 898 (8th Cir. 1975). Likewise, we find that the repetitive use of leading questions in developing the crucial elements of an offense may be so gross that it deprives the accused of a fair trial subject to habeas corpus review. *Taylor v. Minnesota,* 466 F.2d 1119 (8th Cir. 1972), *cert. denied,* 410 U.S. 956, 93 S.Ct. 1425, 35 L.Ed.2d 689 (1973). We find it unnecessary to pass on these questions in light of our reversal, but point them up so as to insure against their repetition. The same is true as to appellant's fourth ground, which questions the reference of the prosecutor in closing argument to another case. He is alleged to have said:

> I know we haven't got a strong case against Mr. Garza, but you will remember that brutal killing of Mrs. Betty Gittings. You turn this man loose and we will have more killings like this.

The closing arguments of counsel to the jury were not recorded, but since the State takes no umbrage at this recollection of the prosecutor's statement, we take it as true. The United States District Judge held it to be inappropriate but minimized its impact as only "one isolated remark in a trial that lasted several days." He found it "not so prejudicial as to make petitioner's trial fundamentally unfair." Apparently no objection by defense counsel was made to the statement. We do not, however, approve or disapprove the trial court finding but mention it in light of our disposition of the case, on the grounds of denial of effective counsel, covered hereafter.

## II.

Garza's argument on his final point has two strings to its bow:

(1) the failure of appointed counsel to adequately prepare for trial; and

(2) his failure to call essential witnesses in Garza's defense.

All of Nebraska's courts, including its supreme court, and the United States District Court on habeas corpus have found the claim to be without merit. This gives us pause in reversing, especially in light of the meticulous care with which each has treated the case. However, our careful examination of the record reveals that those rulings were predicated on misinterpretations of the record.

A.) The Supreme Court of Nebraska, in rationalizing why Garza's lawyer did not put Louis Godoy on the stand, stated that Godoy " * * * when asked if he told the defendant's trial counsel that the rape did not happen, he answered that he told him that he did not know. The defendant's trial counsel, after this conversation with Godoy, informed him that he would be of no help." *State v. Garza, supra,* 214 N.W.2d 30, 31. Apparently the court adopted this view from the testimony of Louis Godoy at the post-conviction hearing in the District Court of Douglas County, Nebraska, and filed in the supreme court on July 13, 1973, as a *Bill of Exceptions.* The last two questions of Godoy on direct examination were:

Q. But you did tell him that you were present when this rape was supposed to have taken place?

A. Yes, I told him what I knew.

Q. And it didn't happen?

A. Yes, I told him that and I don't know, he said he couldn't—he said I would be of no help to him.

*Bill of Exceptions,* at 12.

However, closer examination of the testimony of Godoy shows that Godoy did know. Godoy swore that he was with Garza on the night of the alleged

rape and if called to testify would have testified that it "was impossible;" that he was never more than twenty feet from the car and "didn't see any incident at all;" that Garza's father brought him to talk to the son's lawyer and he (Godoy) told him what he "could testify to," but that the lawyer did not call him as a witness because "he said something that due to the fact that in the Courtroom there was something in the Courtroom that he didn't think that he could use my testimony; that it wouldn't help him none. I don't know, it just seemed like he wasn't interested, you know." *Id.* at 11–12. And on cross-examination, Godoy confirmed this testimony.

Q. Did you ever leave Vincent and the girl alone?

A. Yes, you know, me and Steve asked if we could get out and go to the restroom and we left and the car was parked about like over here (indicating) and I would say it was about no more than 20 feet because we just went where there would be some brush or some bushes.

Q. Then when you came back was everything okay?

A. Yes.

Q. And the girl wasn't crying?

A. No.

Q. Her clothes weren't ripped?

A. No.

Q. Did you ever leave Vincent and the girl again?

A. No.

Q. Did you tell this to Vincent's lawyer?

A. Yes.

*Id.* at 13–14.

And, on re-direct, Godoy again stated that he and Steve Garza walked into the bushes only about 20 feet from the car. He then testified:

Q. How long were you gone from the car?

A. Long enough to pee, I guess you know. I didn't look at no clock—

just long enough to pee and come back.

Q. Just urinated and came back.

A. Yes.

Q. That was the only time. You know that was the only time Vincent was alone with the girl?

A. Yes, I do.

*Id.* at 16.

By the Court: Is it your testimony that Vincent Garza never got out of the car at all?

A. Yes, it was.

By the Court: He never did get out of the car?

A. No, he didn't.

By the Court: The girl never got out of the car?

A. No.

By the Court: That's all.

Mr. Carey (continued): Could they have gotten out of the car for a minute while you were gone, before you got back in?

A. No, I doubt it. I don't believe he was out very long because when we came back they were sitting in the front seat and the radio was on. It was on, too.

*Id.* at 17.

B.) We now analyze the findings of the United States District Judge in the habeas corpus proceeding. The judge, in his opinion filed May 13, 1975, found that Garza's counsel "made unsuccessful attempts to have Steve Garza testify on his brother's behalf at trial." Memorandum Opinion, Civ. 74–L–73, at 3–4. However, Steve Garza testified at the state post-conviction hearing that he was in Monmouth, Illinois, at the time of the trial. On direct examination he testified:

Q. Did you get a telephone call from somebody about your brother, Vince, was going to be on trial?

A. No, we didn't have a telephone up there then.

Q. Did you?

A. No, we didn't own a telephone.

Q. Did anybody contact you by mail or contact you in any way that your brother was on trial?

A. No.

*Bill of Exceptions,* at 18.

Indeed, Steve testified that he did not know of his brother's conviction until "about maybe two weeks after he was convicted." *Id.* at 19. He had left Omaha about a week after the alleged rape. Garza was not charged and arrested until two weeks after the event. Steve did not even know that his brother had been arrested until his return to Omaha. *Id.* We note also that Steve testified that he "would have testified there was no rape." *Id.* at 20.

It is interesting to note also that Jerry Garza, the appellant's father, testified that "yes", the appellant had asked him to "get a hold of Steven." *Id.* at 29. He was unable to do so since the request did not come until the first day of the trial.

The United States District Judge also found that Garza's counsel only conferred with the appellant once and did not talk to Mr. Mueller at all, "but there is nothing he could have learned from Mueller that he did not already know from talking to Godoy." *Mem. Op., supra* at 4. This, of course, is a non sequitur since Godoy testified, as we have stated *supra,* that the counsel was told exactly the opposite to what the court attributed to him. Apparently the United States District Judge took his finding from the erroneous report of it in the Supreme Court of Nebraska opinion, *supra.*

The United States District Judge also found that Garza testified "that he was alone with the prosecutrix for about ten minutes instead of only a minute or two * * *." *Mem. Op., supra,* at 4. He, therefore, reasoned that counsel did not call Steve Garza and Mueller because they would have testified that they were out of the car only a minute or two which would have contradicted the ten minutes testimony attributed to Garza. However, we find nothing in the record to support the finding that Garza testified that he was with the prosecutrix alone for about ten minutes. At the state trial, the following testimony was given by Garza:

Q. Did anything else happen there in the park?

A. Uh, one car came by and the guys asked, they told me the ten minutes was about up, was we going to leave and I said 'yes.' And I went to the bath room.

*Trial Transcript,* at 135.

This reference undoubtedly was to the fact that when Ron Bartlett was dropped off, Garza promised to return for him in ten minutes. This fact again is evident from trial testimony:

Q. Did you give them (Gerda and Ron) a ride?

A. Yes, I did.

Q. And where did you go?

A. I dropped them off where he told me to and he asked, if I could, to pick him back up in about ten minutes and I said I could.

*Id.* at 130.

The ten minutes was the total elapsed time and not just the time spent in the park.

C.) There is a third reason why Garza should have a new trial. He requested his counsel to inquire of the Omaha police concerning a statement given them by Gerda as to the rape. Counsel failed to follow up the lead. The story was published in the *Omaha World Herald* and is Exhibit 6 in the federal post-conviction hearing. The article is headlined: "Police Seeking Rape Suspect." The article quotes Gerda as telling the police that "she and a girl friend accepted a ride home from school with a carload of five boys, one of whom she knew. After riding around for several hours, everyone but the girl and the driver of the car got out near the home of one of the boys * * * The driver then drove with her to Mandan Park where the assault occurred, officers said she told them."

■ We conclude that counsel was delinquent in not calling as witnesses each of the persons that accompanied Garza in the car at the time of the alleged rape as well as his failure to investigate the police report published in the *Omaha World Herald*.[1]

For the reasons stated, as well as other examples of ineffective assistance of counsel which we need not enumerate but which are discernible in the record, the judgment is reversed and remanded. The United States District Court is instructed to enter an order enabling the State to retry Garza within a specified period of time. In the event the State fails to try Garza in the specified period of time, the United States District Court shall order the State to dismiss the indictment.

It is so ordered.

ROSS, Circuit Judge (dissenting).

In my opinion the reversal in this case results primarily from our court engaging in hindsight concerning the trial tactics of the defense attorney. I agree with the views of Judge Schatz stated in his unpublished opinion as follows:

A review of the entire record and proceedings clearly indicates that Mr. Cullan conducted a vigorous and knowledgeable defense, not impeded by lack of necessary investigation or preparation, and that he exercised, rather than abdicated, his professional judgment. There is no question but what this was a close case wherein the jury had difficult evidentiary discrepancies to resolve, and resolved them against petitioner. But the measure of defense counsel is not whether he ultimately prevails in a close case or is completely errorless or is judged ineffective or questionable by hindsight. Rather, the test is whether his representation renders the trial a farce, or a mockery of justice, or is shocking to the conscience of the Court, or was only perfunctory, in bad faith, a sham, or pretense, or without adequate opportunity for conference and preparation. *See, e. g., Crismon v. United States,* 510 F.2d 356 (8th Cir. 1975); *Scalf v. Bennett,* 408 F.2d 325, 327–28 (8th Cir. 1969). Judged by these standards, and in view of the fact that the witnesses' potential testimony, *supra,* would have been materially inconsistent with petitioner's testimony, the Court cannot say that Mr. Cullan's decision not to call these witnesses to testify amounted to a "mockery of justice" within the meaning of *McQueen* [*McQueen v. Swenson,* 8 Cir., 498 F.2d 207] and *Garton v. Swenson,* 497 F.2d 1137, 1139–40 (8th Cir. 1974). *See DeBerry v. Wolff,* 513 F.2d 1336 at 1340 (8th Cir. 1975).

This court has recently engrafted a caveat upon the mockery of justice standard to the effect that

* * * we have never intended it to be used as a shibboleth to avoid a searching evaluation of possible constitutional violations; nor has it been so used in this circuit. It was not intended that the "mockery of justice" standard be taken literally, but rather that it be employed as an embodiment of the principle that a petitioner must shoulder a heavy burden in proving unfairness.

---

1. Contributing in substantial part to counsel's admitted inability to properly prepare for trial was the state district court's denial of his requested continuance on the day of the trial. Garza's counsel had experienced unfortunate family difficulties. Early in 1970 his wife had given birth to premature twins, a boy and a girl, who suffered from serious birth defects necessitating constant care and frequent hospitalization. In September his wife collapsed from the strain and had to be hospitalized herself.

On November 22, 1970, only ten days before trial, the boy baby died. After the funeral the lawyer and his wife went for a week to his parents' farm to rest. He returned to work the day before the trial. At this time his baby daughter was still hospitalized in grave condition.

The next day counsel requested a continuance on the ground that these facts had prevented adequate preparation on his part. The request was denied and the trial commenced that day.

*McQueen v. Swenson,* 498 F.2d 207, 214 (8th Cir. 1974). However, in my opinion the petitioner in this case has not shouldered that heavy burden in proving unfairness.