Sanford THOMAS, Appellant,

v.

Donald WYRICK, Appellee.

No. 75–1699.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 15, 1976.

Decided April 28, 1976.

Rehearing and Rehearing En Banc Denied May 28, 1976.

---

8. The jury asked two questions. The first, "(1) May we have the dates of the fires?" was answered by the court. The second question

Jack M. Chasnoff, Tucker & Chasnoff, Clayton, Mo., made argument for appellant.

John C. Danforth, Atty. Gen., and Neil MacFarlane, Asst. Atty. Gen., Jefferson City, Mo., made appearance for appellee and filed brief for appellee.

Before CLARK, Associate Justice, Retired,* and BRIGHT and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

Sanford Thomas seeks habeas corpus relief from his conviction in the state courts of Missouri of first degree murder and from his sentence of life imprisonment. The district court, after an evidentiary hearing, denied Thomas any relief. Thomas appeals, asserting that the assistance afforded by his retained trial counsel fell below minimal constitutional standards and that the prosecutor violated due process by falsely stating that a crucial witness was unavailable due to illness. Thomas has fully exhausted his state remedies.[1]

---

* ASSOCIATE JUSTICE TOM C. CLARK, Retired, United States Supreme Court, sitting by designation.

1. The Missouri Supreme Court affirmed Thomas' conviction on direct appeal. *Missouri v. Thomas,* 440 S.W.2d 467 (Mo.1969). Two

The basic facts underlying petitioner's conviction are relatively uncomplicated. The Missouri Supreme Court accurately summarized them as follows:

On Sunday evening, November 27, 1966, defendant had been riding around the North Florissant and Cass Avenue neighborhood in St. Louis with a number of other youths. About 8 p.m., they went to the Greyhound Bus Station. At the station one Frederick Brown and defendant got into a taxicab, driven by John Dougherty, and the cab proceeded south on Broadway. One of the youths who had been with Brown and defendant at the bus terminal came back to where the others were parked and reported that Brown and defendant were going to 16th and Mullanphy. The others tried to follow the cab but lost it in the traffic and then drove to Brown's house. Sometime later, Dougherty was found in the front seat of his cab at 16th and Mullanphy unconscious. A tooth was knocked out and he was bleeding from two stab wounds in his chest, which wounds proved fatal.

There was further testimony that Brown and defendant later went to Brown's house and entered the back door into the kitchen where the other boys were assembled, and that they threw a watch and wallet on the table and said "that was all they got, they robbed the cab driver." [2] The watch and wallet were later identified as having belonged to Dougherty. One of the youths told his father something about what had occurred and his father reported the matter to the police.

years later, that court considered Thomas' application for post-conviction relief. *Thomas v. Missouri*, 465 S.W.2d 513 (Mo.1971). At that time the Missouri Supreme Court remanded for a new evidentiary hearing and directed the lower court to make specific findings of fact and conclusions of law on all issues presented. After that hearing, the Supreme Court, sitting *en banc*, denied Thomas relief. *Thomas v. Missouri*, 512 S.W.2d 116 (Mo.1974) (*en banc*). Four justices concurred in the opinion, two concurred in the result, and one justice dissented.

Brown was arrested the next day and pointed out to officers a garbage can in which they found portions of the partially burned wallet and pieces of charred paper that had been in it. The knife used in the murder was given to Niles Pursley by Brown's girl friend and was recovered by the police.

Defendant, who apparently had no previous criminal record, was the only witness for the defense. He stated that after he and Brown entered the cab Brown whispered, "Let's rob the cab driver," but that he refused to go along with that plan and got out of the cab at 14th and Cass. He further stated that he later got another cab and went to 18th and Cass to see if Brown was at his mother-in-law's house; that about that time he saw Brown walking up the street so they both got into another cab and went to Brown's house, where they went inside. Defendant denied participating in the crime and denied that he and Brown walked into the kitchen and threw the watch and wallet on the table and said, "That's all we got out of the robbery." [512 S.W.2d at 118.]

We may also note that Thomas was age 17 at the time of the crime and age 18 at the time of the trial.

Appellant's claim to habeas corpus relief centers primarily upon the admitted failure of his retained trial counsel, Alfred I. Harris (now deceased), to interview any witnesses who might have lent support to petitioner's testimony that he was not present at the time when John Dougherty was killed. The state court found that defense counsel Harris did not interview any witnesses but confined his investigation to dis-

2. Although it was not made clear, this statement was evidently made by Brown, not Thomas. It was admitted against petitioner on the theory that his failure to deny the statement was an implicit admission of guilt. We note that there was no attempt at trial to show that the circumstances of the statement were such as to clearly implicate petitioner and to call for a denial if untrue.

cussing the evidence with the prosecutor, learning of the confession of Frederick Brown, Jr. which implicated the petitioner,[3] and reviewing the contents of the state's file, which included statements of the witnesses endorsed by the state on the indictment. See note 6 infra, for an explanation of the practice of endorsement.

Petitioner asserts that there were at least three groups of witnesses which his attorney should have interviewed. First and foremost, petitioner asserts that his counsel should have interviewed Frederick Brown, who had admitted participating in the killing. Brown was clearly available to defense counsel had he wished to conduct an interview. Harris was retained as petitioner's attorney shortly after petitioner was first arrested in February of 1967. Petitioner was confined in the St. Louis city jail from that time until his trial on November 13, 1967. Brown was confined in the same jail. He pleaded guilty to murdering Dougherty on October 17, 1967, and remained in the St. Louis city jail until November 9, 1967, four days before the commencement of petitioner's trial.

The second group of potential witnesses were those other young men who were with Thomas and Brown before and after the killing. Harris evidently made no attempt to interview any of these individuals. Several of these were endorsed on the indictment as potential state witnesses and two, Lonnie Anderson and Niles Pursley, testified for the state at trial.

Thirdly, Harris made no attempt to interview any of the individuals which petitioner asserted he had met at the house of Brown's mother-in-law during his search for Brown after he claimed he had gotten out of the cab. These individuals were Brown's wife, and her cousin. The state court found that had Harris contacted these individuals they would have testified "that Sanford Thomas arrived at their house at some time during the evening and then left." The factual basis for this finding is not clear as these persons did not testify at any post-conviction hearing. Evidently the state court either credited petitioner's testimony or assumed these witnesses would support Brown's statement in some degree. Petitioner testified at the post-conviction hearings that not only would these individuals have confirmed that he came to their house, but also would have testified that he came there alone and that he was looking for Brown.[4]

It is not clear why defense counsel made no attempt to contact the persons present at the house of Brown's mother-in-law. They were not endorsed on the indictment as witnesses for the state. Evidently counsel was content to rely on Thomas' testimony alone to establish the facts to which these witnesses could testify.

However, matters are clearer with respect to defense counsel's failure to interview Brown and the other young men who were present before and after the alleged crime. These individuals had been endorsed

---

**3.** This confession is referred to in the testimony at the post-conviction hearings but was not introduced into evidence.

**4.** Additionally, if Brown's statement is credited that he stopped at the house of Brown's mother-in-law, an investigator should ordinarily have sought further verification of Brown's statement through the taxi driver who was called by Thomas, as well as the taxi driver who delivered Thomas alone to the home of Brown's mother-in-law. As has already been noted, petitioner testified at trial that after getting out of the cab occupied by Brown and Dougherty at the corner of 14th and Cass, he walked south on 14th Street hoping to see his friends following in another car. When they did not appear, petitioner testified that he caught a second cab and went to the home of Brown's mother-in-law looking for Brown. While there, he testified that he called a "Victor cab." He testified that when he left the house, this cab was in the street honking for him; as he went toward the cab he met up with Brown. They then traveled together to Brown's home in the Victor cab. As we have noted, Thomas' attorney took no steps to verify his client's claim of innocence. Because no issue was made below of attorney Harris' failure to attempt to locate these drivers, we do not rely upon this omission as demonstrating incompetence of counsel. Our comments nevertheless illustrate the obvious—failure of any investigation precluded any possibility of obtaining evidentiary support for Thomas' claim of innocence.

by the prosecutor upon the indictment as state witnesses. *See* note 6 *infra.* Defense counsel testified at the post-conviction hearings that in order to avoid the appearance of impropriety he followed an established custom of not interviewing any government witnesses.

Although Brown was endorsed as a state witness, he did not testify at trial. When the trial commenced, the prosecutor informed the court that Brown would not be called. Defense counsel objected, stating that he anticipated eliciting favorable testimony from Brown on cross-examination.[5] The prosecutor then explained to the court that Brown was suffering from hepatitis and was quarantined. After being so informed, the trial court declined to order the prosecution to call Brown as a witness, but offered to provide assistance to the defense should it wish to call Brown. This offer was never accepted.

It now has been stipulated that the prosecutor was in error when he stated that Brown was quarantined at the time of trial. The basis for this mistake is not clear. There is some indication that a prisoner with a very similar name was in isolation at that time.

All of these events became revealed in dramatic highlight two years after petitioner's conviction when Brown recanted his statements implicating petitioner in the murder. He announced that he had implicated petitioner in order to protect two other individuals who were his close friends. He further stated that had he been interviewed by defense counsel, he would have told the truth at that time. Petitioner asserts that this clearly demonstrates that his counsel's failure to conduct an adequate investigation deprived him of effective assistance of counsel. Petitioner also asserts that in light of Brown's present testimony, the prosecutor's misrepresentation that Brown was unavailable at the time of the trial amounted to a denial of due process and requires reversal.

## I. *Standard of Review.*

The district court expressed some uncertainty as to the proper constitutional standard by which petitioner's claim of ineffective assistance of counsel should be assessed. After reviewing our decisions the district court concluded that this circuit still adheres to the "farce or mockery of justice" standard. Applying this standard the district court denied petitioner any relief. However, the district court made the following observations:

> This is, undeniably, a close case. If the applicable rule were * * * "reasonably competent assistance of counsel", I believe petitioner would not have been afforded his constitutional right to assistance of counsel.

Because there has been some variance in the language of our opinions and because the proper standard is important in determining this close case, we think it advisable for us to review the applicable law of this circuit.

We first considered an allegation of inadequate investigation and preparation by counsel in *Cardarella v. United States,* 375 F.2d 222 (8th Cir. 1967). There we said that

> a charge of inadequate representation can prevail "only if it can be said that what was or was not done by the defendant's attorney for his client made the proceedings a farce and a mockery of justice, shocking to the conscience of the Court." [*Id.* at 230 (numerous citations omitted)].

As the cases cited in support of that statement demonstrate, the "farce and mockery" standard was universally accepted at that time.

However, having enunciated this apparently harsh standard, the *Cardarella* court then undertook a careful analysis of appellant's claim. The court first noted that the general competence of Cardarella's counsel was unquestioned. The opinion of the district court was quoted as follows:

---

**5.** Defense counsel has testified that this statement was simply bluster and that in fact he was relieved that Brown would not be called.

His chief counsel has long been recognized as one of the most outstanding criminal lawyers at the Kansas City Bar, both Federal and State, and has enjoyed unusual success in the trial of criminal cases.

His associate counsel was a former member of the Federal Bureau of Investigation, and former assistant to the Attorney General of the United States, and long engaged in the practice of law at the Kansas City Bar. [*Id.* at 229.]

Although convinced of defense counsel's general competence and effectiveness, the court then examined the three specific grounds which appellant claimed demonstrated inadequacy. Two of the grounds concerned counsel's choice of issues to urge on appeal. These were found to lack substantial merit. The third ground was counsel's failure to discover two police reports. The court carefully examined the reports, analyzed their availability to counsel and concluded that counsel's failure to discover one of the reports demonstrated a " 'lack of diligence,' in a legal sense." *Id.* at 232.

The court therefore undertook to review the entire record to determine whether this error by counsel was so prejudicial as to warrant reversal. The court concluded that there had been no "failure to present the case in any fundamental respect" and that

[t]he one instance in which there was a "lack of diligence," in a legal sense, in "discovering" evidence does not suffice to overcome the overwhelming proof of record demonstrating the adequacy and ability of counsel, particularly where the evidence in question, even if availed of, could not have produced a different result. Our examination of both the trial and appellate record satisfies us that counsel for all defendants thoroughly prepared and tried the case with great resourcefulness, competently presented the available defenses, and disclosed all weaknesses and inconsistencies in the government's case. [*Id.* at 232.]

Our subsequent cases have followed the approach of *Cardarella* in assessing claims

that an attorney's inadequate investigation or preparation denied a defendant's right to assistance of counsel. In *Garton v. Swenson,* 497 F.2d 1137 (8th Cir. 1974), the district court had denied a habeas petition without an evidentiary hearing, ruling that the "farce and mockery" standard precluded relief. We reversed and remanded for a full hearing. Judge Stephenson's opinion emphasized that

[w]e have based our decisions concerning effectiveness of counsel upon the particulars of each case. The standard for effectiveness is not easily reduced to precise words capable of rigid application. [*Id.* at 1140.]

In *Wolfs v. Britton,* 509 F.2d 304 (8th Cir. 1975), the tardy appointment of trial counsel had compelled him to try the case by the "seat of his pants." Petitioner urged that he had been denied his right to effective assistance of counsel even though his attorney's general ability and trial performance were unquestioned. We noted our obligation to proceed on an "ad hoc" basis giving due consideration to all factors bearing on counsel's performance and any resulting prejudice, including the strength of the government's case. *Id.* at 310. We decided that under the "combination of circumstances" counsel's lack of time to adequately prepare and investigate denied petitioner his right to effective assistance of counsel.

Our case most similar to the present one is *McQueen v. Swenson,* 498 F.2d 207 (8th Cir. 1974). *McQueen* reaffirmed the traditional "farce or mockery" standard. However, it included the following explanation:

Stringent as the "mockery of justice" standard may seem, we have never intended it to be used as a shibboleth to avoid a searching evaluation of possible constitutional violations; nor has it been so used in this circuit. It was not intended that the "mockery of justice" standard be taken literally, but rather that it be employed as an embodiment of the principle that a petitioner must shoulder a heavy burden in proving unfairness. [*Id.* at 214.]

*See Garza v. Wolff,* 528 F.2d 208 (8th Cir. 1975) (Ross, J., dissenting).

## II. Burden of Proof.

■ As we said in *McQueen,* the failure of defense counsel to provide adequate assistance is a unique form of constitutional error. It creates a "flaw in the adversary process", *id.* at 218–19, not attributable to the fault of either the government or defendant, and it undermines the integrity of the trial process in which all parties have a vital interest. However, despite the importance of assuring that a defendant is not denied adequate assistance of counsel, we emphasized that "there is and should be a presumption that counsel is competent," *id.* at 216, and we reiterated the "sound precept" that "the exercise of a defense attorney's professional judgment should not be second-guessed by hindsight." *Id.* Because of these considerations we recognized that one challenging an attorney's exercise of professional judgment must "shoulder a heavy burden." *Id.* at 214.

However, these general considerations were found to be largely undercut by the defense counsel's custom of not interviewing government witnesses. There defense counsel testified that

> I never like to go out and interview State's witnesses. That is the duty of a

detective or somebody to go to the Court and make an application. It is too subject to bribery offers. It puts you in a bad light. You can be accused of many things. I don't care to get into that. [498 F.2d at 212.]

Trial counsel in this case has testified he followed an identical custom. In *McQueen,* we found that this "absurd and dangerous policy" contravened the attorney's essential duty to make an adequate factual investigation and could only be viewed "as an abdication—not an exercise—of his professional judgment." *Id.* at 216.

■ Such a wholesale abdication of responsibility is significant in two respects. First, the failure of an attorney to exercise his professional judgment on behalf of his client is itself a serious breach of the lawyer's duty.[6] Second, and more important, for counsel habitually to disregard available information tends to erode the presumption of regularity and competence which normally attaches to an attorney's decision.[7]

However, in *McQueen,* we made clear that:

> Our inquiry as to whether or not to grant relief is not concluded by finding a constitutional violation in the failure of petitioner's attorney to make an adequate investigation of the case. Evaluation of a habeas corpus petition alleging ineffec-

---

6. Canon 5 of the ABA Code of Professional Responsibility provides that "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." Canon 6 provides that "A Lawyer Should Represent a Client Competently." D.R. 6–101(A)(2) forbids a lawyer to "[h]andle a legal matter without preparation adequate [under] the circumstances." Rule 4 of the Missouri Supreme Court Rules adopts these principles.

The Missouri Supreme Court Rules also provide that certain information is always available to the accused. Supreme Court Rule 24.17 requires that

> [w]hen an indictment * * * is filed the names of all material witnesses for the prosecution shall be endorsed thereon.

Rule 25.32 requires that upon request the state must disclose

> [t]he names and last known addresses of persons whom the state intends to call as witnesses * * *.

Obviously these rules are intended to assist the defense in adequately preparing for trial.

Chief Judge Gibson has suggested that the right to effective assistance of counsel should be assessed in light of the standards "prevailing among those licensed to practice before the bar." *Johnson v. United States,* 506 F.2d 640, 646 (8th Cir. 1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1404, 43 L.Ed.2d 659 (1975). We cannot believe that it is the prevalent practice for Missouri defense counsel to invariably ignore sources of information about a crime made available to the defense by court rule.

7. We emphasize that we are faced with a *general policy* of not interviewing government witnesses. We recognize that in particular cases, an attorney's professional judgment may lead him to decline to interview some or all of the government's witnesses and to rely on other sources of information. Such an exercise of professional judgment will be given the same deference as any other.

tive assistance of counsel is a two-step process: first, determining * * * whether there has been a failure to perform some duty, as essential as the duty of investigation, owed by a defense attorney to his client; and second, determining * * * whether that failure prejudiced his defense. [498 F.2d at 218.]

▪ Clearly, a defendant must bear the initial burden of demonstrating that counsel failed to perform some essential duty. However, once this failure has been established, it is not so clear which party bears the burden of establishing that counsel's error so significantly undercut the reliability of the trial process as to require reversal. As we recognized in *McQueen,* the circuits disagree on this point. *Id.* at 219. After reviewing the leading cases on both sides of the issue, we adopted a "flexible approach," generally imposing the burden of demonstrating unfairness on the petitioner. *Id.* at 220. This decision was based on two considerations. First, we are unwilling to disturb criminal convictions simply on the basis of theoretical flaws that have no real world consequences. Secondly, as a practical matter, we recognize that proof of prejudice is usually more within the knowledge of the petitioner.

▪ The allocation of this burden is a judicial tool designed to assist in the determination of the truth. If the particular circumstances of the case require a different allocation of the burden, that allocation

will be adopted. *Cf. Wolfs v. Britton, supra.* Secondly, we emphasized that where the attorney's breach of duty has been serious, it is not necessary that the petitioner demonstrate by a preponderance of the evidence that adequate representation would have produced an acquittal. The petitioner need only shoulder the additional burden of showing that the alleged error itself sufficiently undercut the reliability of the trial process to have prejudiced the petitioner's right to a fair trial. As there had been no evidentiary hearing in *McQueen* directed to whether prejudice flowed from ineffective assistance of counsel, we remanded for a further evidentiary hearing. Here we have a full record. We, therefore, address the question of prejudice.

### III. *Proof of Prejudice in This Case.*

▪ We have already held that defense counsel-Harris' failure to interview any witnesses pursuant to his absurd and dangerous general policy against doing so constituted a breach of an essential duty owed by counsel to petitioner. Therefore, we must consider whether the effects of that breach of duty raise a serious question as to the reliability of the trial process in this case. The Missouri Supreme Court held that the petitioner had not met his burden of showing prejudice. Relevant portions of the court's opinion are excerpted in the margin: [8]

The question presented for our consideration requires that we examine the record to

---

8. Complaint is also made of [Harris'] failure to interview witnesses. There was certainly no occasion for him to interview Brown because he had decided not to use Brown as a witness in any event. There is a sound basis for the conclusion of Mr. Harris not to use Brown even if he had agreed to repudiate his confession and to testify that defendant was not involved. This because there was no direct testimony that defendant was in the cab when the crimes were committed, and it could have been very damaging to defendant for evidence to have come in (even though for purpose of impeachment) giving details of his participation in the robbery and murder. As to the two persons whom defendant said were at the home of Brown's mother-in-law, it is conceded that Harris did not interview them. There is, however, no showing that

they would have been helpful to defendant. Actually, defendant's testimony would indicate the contrary. He stated he did not arrive at the house until from 30 to 45 minutes after he left the cab. The murder took place three blocks from the place where he got out. It would therefore be reasonable to conclude that those proposed witnesses would not have established an alibi for defendant.

* * * * * *

Defendant next contends that his defense was prejudiced by the fact that the prosecutor gave false information to the court as to the illness of Frederick Brown and that he was misled thereby. What we have heretofore said will indicate our view that defendant was not prejudiced by that development. There is a reasonable basis for the view that it was to defendant's benefit that Brown did

determine whether the absence of investigation by Thomas' counsel prejudiced the petitioner in failing to obtain a fair trial. We held in *McQueen* that

the petitioner must shoulder an initial burden of showing the existence of admissible evidence which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant either on cross-examination or in his case-in-chief at the original trial. [498 F.2d at 220.]

As we have already noted, Brown has recanted his confession and supported Thomas' claim of innocence, first by an affidavit signed on November 3, 1969, almost two years after the Thomas trial. Brown supplemented his affidavit by his testimony given at the Missouri post-conviction hearings stating that Lonnie Anderson, who had followed the taxicab in an automobile, and Walter Williams,[9] who entered the cab prior to the crime, participated with Brown in Dougherty's murder. He further stated that in his confession he had implicated Thomas to cover up the participation of Williams and Anderson. He explained that he had decided to tell the truth because neither Anderson nor Williams had done anything to help him (Brown) while incarcerated. He also testified that if he had been called as a witness at the Thomas trial, he would have told the truth, *i.e.*, that Thomas was innocent.

This testimony if produced at Thomas' trial and if believed by the jury, would have

mandated an acquittal. Even if Thomas' counsel had made a reasoned decision not to call Brown in order to preclude his confession as impeachment evidence, the information now uncovered would have armed Thomas' counsel with ammunition upon which to cross-examine witnesses Anderson and Niles Pursley. The original trial record, which is part of the record in this case, discloses that Anderson was arrested following this crime. Pursley was another of the young men who had been with Brown at the bus station and at Brown's home the evening of the crime, and who testified for the state.

Anderson testified at the murder trial that on the day after the crime, Brown, in admitting that he had stabbed the cab driver, made no mention of Thomas' presence. *See* 512 S.W.2d 124 (dissenting opinion). At the murder trial Anderson testified that he told a police officer Brown said on entering his apartment "we stuck up a cab driver," then laughed and said "Yeah, I stabbed him."

In the statement of facts summarized *supra,* the testimony indicated that one of the other young men who had been with Brown at the bus station reported that "Brown and defendant were going to 16th and Mullanphy." Brown's postconviction testimony indicated that Williams got in the cab at 16th and Mullanphy.

With this background, counsel for Thomas was in a position to vigorously pursue

---

not appear as a witness. If he had testified against defendant it would have been very damaging to his defense. If he had been a witness for either the State or defendant, and had repudiated his confession involving defendant as an active participant, he could have been impeached by showing all the details of the confession as to defendant's part in the commission of the crimes. Since Mr. Harris did not intend to use Brown as a defense witness, there was no prejudice resulting from the incorrect information furnished by Mr. Fredericks. We accordingly rule this point against defendant.

\* \* \* \* \* \*

The next contention of defendant is that "Judge Palumbo erred in treating Frederick Brown's credibility as an issue in the eviden-

tiary hearing \* \* \*." \* \* \* It is always proper to cross-examine a witness about any relevant matter in order to test his credibility. Also, the credibility of a witness is always a proper matter for the consideration of the trial court. As we understand the trial court's finding, it was to the effect that the court did not believe Brown's testimony and hence his testimony afforded no basis for setting aside the judgment. The court did not find, as defendant seems to indicate, that a jury would not believe Brown in the event he testified at a trial on the merits. This point is therefore overruled. [512 S.W.2d at 122–23.]

**9.** Williams is now deceased.

state's witnesses Anderson and Niles Pursley, determine whether Pursley's version of Brown's statement that "they robbed the cab driver" meant Brown and Thomas or Brown and one of the other young men, and to otherwise cast doubt on the prosecution's theory that Brown and Thomas remained together from the time witnesses testified to their entry into Dougherty's cab until witnesses placed them both at Brown's apartment at a later time.

Finally, knowledge of this information would have cast doubt upon defense counsel's ready acceptance of the state's evidence [10] and should have motivated inquiry of those present at the home of Brown's mother-in-law to ascertain whether Thomas had separated from Brown at any time after the two of them got into the cab at the bus station. But attorney Harris' failure to investigate foreclosed every avenue of support for Thomas' consistent protestation of innocence, a position which partakes of some credence since at the opening of trial he declined to accept a 10-year sentence in return for a guilty plea. Harris also testified that Thomas was "very adamant in his position."

The Missouri courts and the federal district court found Brown's statement as lacking credibility—in the words of the federal district court "unbelievable." In denying relief, the district court therefore concluded:

Under all the evidence, this Court finds that petitioner has failed to sustain his burden under *McQueen* of showing that there existed admissible evidence from witnesses "which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant . . . at the original trial."

But credibility does not constitute the standard for evaluating the evidence which could have been uncovered by an investigation.

We said in *McQueen* :

We ought not to intervene in the criminal process unless and until it can be shown that the alleged error itself prejudiced the petitioner in obtaining a fair trial. But this is *not* to say that, on remand, petitioner must prove his innocence even by so much as a preponderance of the evidence; nor should we be understood to suggest that the Court may trespass upon what properly would have been the jury's province of weighing the truth or falsity of this evidence at the original trial. What we are saying is that, here, the petitioner must shoulder an initial burden of showing the existence of admissible evidence which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant either on cross-examination or in his case-in-chief at the original trial. Once this showing is made, a new trial is warranted unless the court is able to declare a belief that the omission of such evidence was harmless beyond a reasonable doubt. [498 F.2d at 220.]

◼ The petitioner has demonstrated that reasonable investigation by Thomas' attorney could have uncovered admissible evidence which would have proved helpful to the defendant either on cross-examination or in his case-in-chief at the original trial.[11] It cannot be said that the evidence is inherently incredible for it is supported by the accused's testimony. The uncovered evidence would be admissible upon a retrial of Thomas. True, this evidence may be considerably tainted through impeachment. But once it is shown that defense counsel breached an essential duty, the sufficiency

---

**10.** Harris testified he knew more about the case than the defendant, Thomas, because he obtained his information from the other side.

**11.** Obviously we cannot say with assurance that Brown *would* have told his present story to Harris had he been properly interviewed. However, in light of Brown's uncontradicted

testimony that he would have told the "truth" and petitioner's insistence that the present version is the truth, viewed together with all of the other facts of this case, we are satisfied that petitioner has demonstrated a sufficient likelihood that an interview of Brown *could* have produced vital testimony.

of petitioner's proof of prejudice turns on whether admissible evidence has been uncovered which a jury could reasonably weigh in assessing guilt or innocence. Obviously a jury could believe all or part of the evidence here under scrutiny. Under the circumstances of this case, we cannot say that the omission of such evidence at the petitioner's trial was harmless beyond a reasonable doubt. Petitioner's proof of prejudice should not be defeated by the district court's low opinion of the credibility of relevant and admissible testimony.

Accordingly, we reverse and remand this case and direct the district court to issue the writ of habeas corpus discharging petitioner, subject to the right of the state, if it wishes to do so, to try him on the indictment here involved within 90 days of the time the mandate of this court reaches the district court.

Reversed and remanded.

HENLEY, Circuit Judge (dissenting).

It is not the function of this court to try petitioner's habeas corpus case de novo; our function is to review the decision of the district court denying the petition, and we are required to accept the factual findings of that court unless clearly erroneous.[1] When that standard of review is applied, I cannot agree with the majority that the record in the case calls for reversal, and for that reason I dissent.

At the outset, I accept the historical facts of the case as set out in the majority opinion. I also accept the proposition that the failure of petitioner's trial counsel to interview Brown, and perhaps other persons involved in the case, cannot be justified by counsel's general policy of never interviewing prospective witnesses for the prosecution. Such a policy is certainly impermissible, regardless of what else it may be called, and I agree with the district court that by whatever standard counsel's conduct may be measured, he failed in the abstract to provide petitioner with the adequate representation of counsel that is called for by the

sixth amendment to the Constitution of the United States as carried forward into the fourteenth amendment.

As the majority recognizes, however, the inquiry does not end at that point. It is also necessary to determine whether counsel's breach of duty was so prejudicial to the petitioner as to require reversal of his conviction on federal constitutional grounds.

With respect to prejudice the majority says that it was not necessary for the petitioner to demonstrate by a preponderance of the evidence that adequate representation would have produced an acquittal, and that his burden was limited to "showing that the alleged error itself sufficiently undercut the reliability of the trial process to have prejudiced the petitioner's right to a fair trial." At 413–414. And the majority also says, " . . . we must consider whether the effects of that breach of duty [to interview] raise a serious question as to the reliability of the trial process in this case." At 414. For present purposes at least, I will accept the majority's definition of the burden of proof as far as prejudice is concerned.

While the majority is critical of the failure of counsel to interview the young men who were in the company of the defendant and Brown before and after the killing of Dougherty and of the failure of counsel to interview the people whom the petitioner claimed to have seen at the home of Brown's mother-in-law while he was allegedly looking for Brown, which interviews might or might not have been productive, and while the majority suggests that counsel would have done well to have tried to locate certain cab drivers who, if they had been found, might or might not have supplied information helpful to the defense, it seems to me that the majority's decision on the issue of prejudice is based ultimately on the failure of counsel to interview Brown himself while Brown was confined in jail in St. Louis.

---

1. Fed.R.Civ.P. 52(a); *Brown v. Swenson*, 487 F.2d 1236 (8th Cir. 1973), *cert. denied*, 416 U.S. 944, 94 S.Ct. 1952, 40 L.Ed.2d 296 (1974); *Taylor v. Swenson*, 458 F.2d 593 (8th Cir. 1972).

The majority is of the view that had Brown been interviewed, he perhaps would have recanted that part of his confession which implicated petitioner in the murder, and that such a recantation would have been of substantial help to petitioner at his trial regardless of whether or not Brown was called as a witness for either side.

Although the majority concedes that it cannot be said with assurance that Brown would have made such a recantation had he been interviewed by counsel (at 416, first sentence, and n.11 appearing on that page), nevertheless, the majority is of the view that the possibility of such a partial recantation was strong enough to cause the failure of counsel to interview Brown to result in a serious undercutting "of the reliability of the trial process which prejudiced petitioner's right to a fair trial." It is at this point that I disagree with the majority.

In my opinion, to say that there was a strong possibility, to say nothing of a probability, that Brown would have exculpated petitioner had Brown been interviewed by counsel, is to engage in pure speculation. And I do not think that a conviction, the validity of which has twice been considered by the Supreme Court of Missouri, in post-conviction proceedings and which has also been considered carefully by the district court should be overturned on such a basis.

Recantations of confessions and changes of story by convicts months or years after their convictions are by no means unusual. There are many motives for such recantations and changes, and they are highly untrustworthy.

I do not think that the Missouri courts were required or that the federal district court was required to accept or give any great weight to Brown's belated affidavit and post-conviction testimony, including his statement that if he had been interviewed while in jail and had been called as a witness, he would have absolved petitioner of any involvement in the robbery and killing of the cab driver.

It must be remembered that Brown kept silence for some two years after petitioner was convicted. He explained his silence by saying that he expected help of an unspecified kind from two alleged accomplices, Anderson and Williams, the latter of whom is now dead, and that he decided to tell the truth after he became convinced that they were not going to afford him any help whether legitimate or illegitimate.

It cannot be ascertained at what point in time, if ever, Brown became convinced that he was not going to receive any help from Anderson and Williams, but the fact that he kept silence for two years justifies the inference that he was harboring his hope of assistance for a substantial period of time after petitioner's trial and conviction, and there is simply no real reason to believe that he would have changed his original story had petitioner's attorney talked to him before petitioner's trial.

Let it be assumed, however, that Brown would have recanted had he been interviewed by counsel. While such recantation may have been of some value to defense counsel in cross-examining prosecution witnesses, it is clear that the most obvious help that Brown could have given petitioner would have been to take the stand and tell the jury that petitioner had left the cab before the killing and had nothing to do with it.

The trouble with that from petitioner's standpoint is that apart from Brown the State had no witness that could from his own knowledge place petitioner in the cab when the driver was killed, and in fact the State was not able to place petitioner in the cab at the time of the killing by means of direct evidence. Had Brown been called as a witness, and had he exculpated petitioner, the State would have impeached him immediately by reference to his confession. Had the defense called Brown, it would have run the risk that the jury would not accept the recantation, and the jury would have gone to its deliberations with knowledge that Brown had implicated petitioner originally. The State did not call Brown, and when it failed to do so, it took a serious risk that the jury would not be convinced of the petitioner's guilt on the strength of testimony of

the witnesses who were called. That risk might well have been eliminated from a practical standpoint had Brown been called as a defense witness; however, had the defense called Brown, it would have taken a serious risk that Brown would recant his recantation and would testify directly that petitioner participated in the robbery that resulted in the killing.

What has been said to this point sufficiently states my views as far as the result of this particular case is concerned. I would affirm. However, in view of the recurrence of post-conviction contentions of inadequate representation by counsel at original trials, the advancing of which has become a standard operating procedure for convicts, and which are most troublesome to judges and embarrassing to the attorneys involved, I feel it desirable to go somewhat beyond this case.

The focus of discussion here has been as to whether or not petitioner sustained prejudice as a result of his attorney's dereliction of duty. However, it is clear from the unpublished opinion of District Judge Nangle that he had some trouble with the standard to be applied in determining whether or not there had been a breach of duty by petitioner's counsel; and he called attention to a number of our decisions which, to use his term, make the applicable standard "a bit unclear." The cases cited were: *DeBerry v. Wolff,* 513 F.2d 1336 (8th Cir. 1975); *Wolfs v. Britton,* 509 F.2d 304 (8th Cir. 1975); *Johnson v. United States,* 506 F.2d 640 (8th Cir. 1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1404, 43 L.Ed.2d 659 (1975); *Crenshaw v. Wolff,* 504 F.2d 377 (8th Cir. 1974), *cert. denied,* 420 U.S. 966, 95 S.Ct. 1361, 43 L.Ed.2d 445 (1975); *McQueen v. Swenson,* 498 F.2d 207 (8th Cir. 1974), and *Cardarella v. United States,* 375 F.2d 222 (8th Cir.), *cert. denied,* 389 U.S. 882, 88 S.Ct. 129, 19 L.Ed.2d 176 (1967).

This writer also had trouble with the applicable standard in cases that he con-

sidered while on the district bench. In *Frazier v. Roberts,* 310 F.Supp. 504, 512 (E.D. Ark.1970), the writer cited with approval the then recent case of *Scalf v. Bennett,* 408 F.2d 325 (8th Cir.), *cert. denied,* 396 U.S. 887, 90 S.Ct. 175, 24 L.Ed.2d 161 (1969), wherein it was held, 408 F.2d at 327–28, that habeas corpus relief would not be granted on account of incompetency of counsel or denial of effective counsel unless the trial was a farce or mockery of justice, or was shocking to the conscience of the reviewing court, or unless the purported representation was only perfunctory, in bad faith, a sham, a pretense, or without adequate opportunity for conference and preparation.[2]

A few years later, the writer thought, largely on the strength of *McQueen v. Swenson, supra,* that the standard announced in *Scalf v. Bennett, supra,* had been replaced by a "reasonable competency" standard such as had been adopted in other circuits. *Clark v. Lockhart,* 379 F.Supp. 1320, 1329 (E.D.Ark.1974), *aff'd,* 512 F.2d 235 (8th Cir. 1975), *cert. denied,* 423 U.S. 872, 96 S.Ct. 139, 46 L.Ed.2d 103 (1976).[3]

Post-*McQueen* cases mentioned by the district court and in the majority opinion of this court indicate that we may have returned to the "farce and mockery of justice" standard of the older cases if, indeed, we ever departed from it, and that we are at least paying lip service to that standard. I fear, however, that what we may really be doing is deciding cases of this kind by hindsight, on a purely ad hoc basis, and without any real reference to any particular standard of the quality of representation constitutionally required or relating to the extent of prejudice that will require a reversal if representation has been inadequate constitutionally. Such an approach, if it is being taken, is in my view undesirable and unfair to district judges, to state courts, and to

---

2. *Frazier v. Roberts, supra,* was reversed by this court, 441 F.2d 1224 (8th Cir. 1971). However, this court did not refer to the standard of representation mentioned by the district court.

3. Again, this court did not discuss the standard employed by the district court.

lawyers who represent defendants in criminal cases.

I recognize that it is extremely difficult to articulate general standards to be applied in this area, and I also recognize that whether a given representation has been constitutionally inadequate and, if so, whether the inadequacy has so prejudiced the defendant as to call for a reversal, must necessarily depend upon a number of factors which vary from case to case. But, I also think that a district judge called upon to decide a case of this kind should have some guidelines to follow, and some assurance as to how his decision will be reviewed on appeal.

In my opinion, the standard laid down in *Cardarella v. United States, supra,* as amplified to some extent in *Scalf v. Bennett, supra,* is an adequate and proper standard to be followed in appraising the constitutional adequacy of representation by counsel in a given case. And I think that this court should announce its adherence to that standard, or to some other standard if the court prefers, and that thereafter we should confine ourselves to exercising our proper appellate function in reviewing decisions of the district court in cases in which they have been called upon to apply that standard. On the other hand, it behooves the district courts to make it clear in their findings or opinions that they have considered the question before them in the light of the prescribed standard.